**In the Matter of David T. DELLINGER et al.**

No. 72 CR 925.

United States District Court,
N. D. Illinois, E. D.

Dec. 6, 1973.

James R. Thompson, U. S. Atty., Gary Starkman, Royal B. Martin, Asst. U. S. Attys., Chicago, Ill., for the United States.

Morton Stavis, and Doris Peterson, Center for Constitutional Rights, New York City, for all defendants.

William M. Kunstler, Center for Constitutional Rights, New York City, and Leonard I. Weinglass, Los Angeles, Cal., for all nonlawyer defendants.

## OPINION AND ORDER
## OF THE COURT

GIGNOUX, District Judge.

This case arose from the 1969 trial of the so-called "Chicago 7," five of whom were found guilty of violations of the 1968 Federal Anti-Riot Act (18 U.S.C. § 2101) after a four and a half month jury trial.[1] At the conclusion of the trial, the trial judge, acting under Fed. R.Crim.P. 42(a), summarily convicted the defendants and their two trial attorneys (the nine original defendants herein) on 159 specifications of contempt of court, in violation of 18 U.S.C. § 401(1).[2] The contempt sentences ranged from two months and 18 days for defendant Weiner to four years and 13 days for attorney Kunstler. On May 11, 1972, the Court of Appeals reversed all the contempt convictions and remanded 141 of the specifications for trial before another judge. In re Dellinger, 461 F.2d 389 (7th Cir. 1972).[3]

Fifty-two of the remanded contempt charges against the present defendants came on for trial before the undersigned,[4] sitting without a jury,[5] on October 29, 1973. At the conclusion of the government's case, which consisted solely of the official transcript of the Anti-Riot Act trial, the Court dismissed two of the specifications and acquitted the defendants of 24 others. This removed from the trial defendants Lee T. Weiner and John R. Froines.

After a four and one-half week trial, the Court has now received the evidence and heard argument on the issues of culpability, extenuation and mitigation (see Seale, 461 F.2d at 372; Dellinger, 461 F.2d at 397) with respect to the 26 remaining specifications against defendants David T. Dellinger, Rennard C. Davis, Thomas E. Hayden, Abbott H. Hoffman, Jerry C. Rubin, and their two trial counsel, defendants William M. Kunstler and Leonard I. Weinglass.[6] The presently relevant evidence consists in main part of the official transcript of the Anti-Riot Act trial (some 23,000 pages), supplemented by selected portions of the court reporter's tape recordings of the trial and the testimony of the defendants, lawyers, witnesses, deputy marshals, members of the press and other spectators who were present at various times during the trial.

The Court's findings of fact and conclusions of law are included in the following opinion. Fed.R.Crim.P. 23(c).

1. On November 21, 1972, the Court of Appeals reversed the convictions on the substantive charges of the five original defendants remanding the charges for a new trial if the government elected so to proceed. United States v. Dellinger, 472 F.2d 340 (7th Cir. 1972). The government has since elected not to proceed with its substantive case.

2. After six weeks of trial, the trial judge had declared a mistrial as to an eighth defendant, Bobby G. Seale. The court simultaneously convicted and sentenced Seale for 16 acts of contempt.

3. In a companion case, also decided on May 11, 1972, the Court of Appeals also reversed Seale's contempt convictions. United States v. Seale, 461 F.2d 345 (7th Cir. 1972). On motion of the government, the contempt charges against Seale have since been dismissed. The government has also dismissed its substantive case against Seale.

4. Pursuant to 28 U.S.C. § 292(c), the Chief Justice of the United States has designated the undersigned for the trial of the remanded contempt charges.

5. The Court having granted the government's motion to limit the maximum sentence imposable against any defendant, in the event of a finding of guilt, to 177 days imprisonment, defendants' motion for a jury trial was denied. In re Dellinger, 357 F.Supp. 949, 955–956 (N.D.Ill.1973). See In re Dellinger, supra, 461 F.2d at 397; Frank v. United States, 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969); Bloom v. Illinois, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968); Cheff v. Schnackenberg, 384 U.S. 373, 86 S.Ct. 1523, 16 L.Ed.2d 629 (1966).

6. The full text of the contempt specifications presently before the Court, together with relevant excerpts from the official transcript which are not included in the specifications, is set forth in the appendix to this opinion.

## I

### CULPABILITY

With respect to each of the 26 contempt specifications presently before the Court, the Court is called upon to determine whether the evidence establishes beyond a reasonable doubt all elements of the crime of contempt charged to the defendant in that specification. *Seale,* 461 F.2d at 372. In making that determination, the Court is governed by the legal standards set forth in the two opinions of the Court of Appeals for the Seventh Circuit remanding the contempt proceedings against the present defendants and those against their former co-defendant Seale, In re Dellinger, *supra* (hereinafter *Dellinger*); United States v. Seale, *supra* (hereinafter *Seale*), as those standards have been further developed in two subsequent opinions in which that court has tested the sufficiency of criminal contempt convictions. In re Chase, 468 F.2d 128 (7th Cir. 1972) (hereinafter *Chase*); Robson v. Oliver, 470 F.2d 10 (7th Cir. 1972) (hereinafter *Oliver*). *See also* Robson v. Malone, 412 F.2d 848 (7th Cir. 1969).

A. *Non-Lawyer Defendants.* With respect to the non-lawyer defendants, the Court of Appeals has made clear in *Seale* that four elements are required to support a criminal contempt conviction under 18 U.S.C. § 401(1).[7] *See generally Seale,* 461 F.2d at 366–371.

(1) *First,* the conduct in question must be "in the court's presence or so proximate that it obstructs the administration of justice." *Id.* at 367.

Here, it is undisputed that the conduct charged took place in the court's presence.

(2) *Second,* the conduct at issue must constitute "misbehavior."

The Court of Appeals has defined "misbehavior" as "conduct inappropriate to the particular role of the actor, be he judge, juror, party, witness, counsel or spectator," the role of each having been "molded to insure that a judicial proceeding is orderly, dignified, and confined to a rational search for truth in the context of defined legal issues." *Id.* at 366–367. The fundamental principle is that "there must be silence except as the orderly conduct of business calls for speech." *Id.* at 367 (quoting from Robson v. Malone, *supra,* 412 F.2d at 850).

(3) *Third,* the alleged contemnor must have acted with the requisite intent.

 The Court of Appeals has defined the minimum required intent as "a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful." *Seale,* 461 F.2d at 368. Thus, proof of a specific intent to obstruct justice is unnecessary to establish the requisite intent. *Id.* at 368–369. A defendant cannot be cited for contempt for borderline conduct, unless he has been first warned that such conduct will be regarded as contumacious. *Id.* at 366.[8] Conduct depicted in the trial transcript, without more, may itself sufficiently indicate intent to satisfy the government's burden of proof on this issue. *Id.* at 369. And finally, the defendant's motivation will not justify his misbehavior; "if his misbehavior was contemptuous within the meaning of the statute, I agree that it could not be excused by a religious or other conscientious motivation." *Chase,* 468 F.2d at 140 (Stevens, J., dissenting).

---

7. 18 U.S.C. § 401 provides in pertinent part: A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
(1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice.

8. Under the intent standard which we will shortly enunciate, a defendant will be protected against the possible unfair surprise of being cited for contempt for conduct that could not be reasonably believed improper when committed. Accordingly, an absence of any warning that borderline conduct is regarded as contumacious could be fatal to a contempt citation therefor. *Seale,* 461 F.2d at 366 (citation omitted).

(4) *Fourth,* the conduct in question must amount to an "actual and material" obstruction of the administration of justice. *Seale,* 461 F.2d at 369.

 The Court of Appeals has rejected a standard which would make punishable "any interruption" which "diverts the judge's attention from the orderly dispatch of the trial." *Idem.* It has stated, however, that "the seriousness of the misbehavior bears on what conduct may be found materially obstructive." *Idem.* Recognizing that "obstruction is an elusive concept which does not lend itself to general statements," *Idem.,* the Court of Appeals has nevertheless delineated certain types of conduct which do and do not rise to the level of obstruction:

(i) "Mere disrespect or affront to the judge's sense of dignity" is not alone sufficient; however, "at some point disrespect and insult become actual and material obstruction." *Id.* at 369–370. "A showing of imminent prejudice to a fair and dispassionate proceeding is, therefore, necessary to support a contempt based upon mere disrespect or insult." *Id.* at 370. In determining whether the disrespectful remarks so imperil the proceeding, the reasonably to be expected reactions of those in the courtroom to the words or acts under scrutiny are relevant," and "the test of contumaciousness of words spoken during a court proceeding is their effect as contemporaneously understood by those who heard the words spoken in the courtroom. This includes the judge as well as other persons present." *Idem.* (quoting from Parmelee Transp. Co. v. Keeshin, 292 F.2d 806, 810 (7th Cir. 1961)).

(ii) The manner in which insulting remarks are spoken may raise otherwise non-obstructive remarks to the level of an obstruction. *Seale,* 461 F.2d at 370. Furthermore, the delays caused by such remarks or other misbehavior may be sufficient to constitute a material obstruction, and thus "if a not insubstantial delay is entirely unnecessary and the misconduct serves, for instance, solely to vent the speaker's spleen, the requisite obstruction would be present." *Idem.* Differences in language patterns between different social, ethnic, political groups are, of course, relevant to the issue of intent. *Idem.*

(iii) "Failure to heed the directive of the Court to desist from arguing, to sit down, or to remain quiet may indeed constitute an actual material obstruction to the administration of justice." *Id.,* 461 F.2d at 371. "A certain amount of leeway must be allowed. But where the directive is clear, the judge's insistence on obedience is not undercut by his further rejoinder, and the party directed understands what is being asked of him, he must obey." *Idem.*

(iv) "Where there is legally adequate representation and no pressing need for the litigant to interject himself into the proceedings, this Court is hesitant to find as a matter of law that any such interjection did not rise to the level of an obstruction." *Dellinger,* 461 F.2d at 401.

 Finally, of particular importance to the present case are two points which the Court of Appeals has repeatedly emphasized:

(1) The Court of Appeals has made clear that "impropriety on the part of the trial judge cannot justify or excuse contemptuous conduct"; judicial error, judicial or prosecutorial misconduct, and judicial or prosecutorial provocation are to be considered only as extenuating and mitigating circumstances. *Dellinger* at 401; *Seale,* 461 F.2d at 361–363.

(2) The Court of Appeals has further made clear that "[t]he standards of proper courtroom decorum are not altered and should not be applied differently because a trial may be characterized as political or because improprieties may be said to spring forth as if a 'natural human response.' " *Seale* at 367. "[T]he court

is not a public hall for the expression of views, nor is it a political arena or a street. It is a place for trial of defined issues in accordance with law and rules of evidence, with standards of demeanor for court, jurors, parties, witnesses and counsel." *Dellinger* at 461 F.2d 401 (quoting from Katz v. Murtagh, 28 N.Y.2d 234, 240, 321 N.Y.S.2d 104, 269 N.E.2d 816, 820 (1971)).

Applying the foregoing standards to the contempt specifications against the non-lawyer defendants, the Court finds that, for the reasons to be stated, these defendants are not guilty of the following charges:

*Davis II, Hayden III, Hoffman II (October 30)*

■ On the afternoon of October 29, after five weeks of trial, the trial judge ordered Seale bound and gagged. This authorized but drastic step was brought on by Seale's persistent efforts to represent himself in the absence of trial counsel of his choice.[9]

On the morning of October 30, the marshals carried Seale into the courtroom in a chair with a massive gag covering most of his face and with his arms and legs strapped to the chair. Mr. Weinglass was cross-examining the witness Frappoly and interrupted his cross-examination to call the judge's attention to Seale, who was groaning, attempting to communicate through his gag, and apparently in considerable pain. The judge excused the jury and directed the marshals to determine whether Seale needed assistance. Several marshals approached Seale's chair. A scuffle ensued in which the chair tipped over, apparently into the first row of temporary press seats in the well of the courtroom.[10] Pandemonium broke out, with counsel, defendants, reporters and spectators on their feet. At this point, Mr. Kunstler approached the lectern and addressed the judge in the language charged in Kunstler I. The court then recessed. When the jury returned to the courtroom, Mr. Weinglass stated it would be impossible for him to continue his cross-examination, with Seale bound and gagged in the courtroom. He requested that the jury be polled as to whether they felt the trial could proceed. The jury was again excused. After extended argument and angry colloquy between the judge and prosecutors, on the one hand, and defense counsel on the other, the motion was denied,[11] and the jury returned to the courtroom. Seale was still trying to be heard through his gag, and the judge ordered him to refrain from making any noise. At this point, Davis rose from his seat at the defense table and made the remarks set forth in Davis II. The jury was again excused. Seale had apparently loosened his gag sufficiently so that he was able to speak, the marshals moved in to adjust his bindings, and there ensued the colloquy set forth in Hayden III and Hoffman II. Shortly after these events, the court recessed the morning session.[12]

9. *See Seale*, 461 F.2d at 349–350. In Allen v. Illinois, 413 F.2d 232 (7th Cir. 1969), which was controlling during the trial, the Court of Appeals had held that an obstreperous defendant could not be excluded from the courtroom, but must be bound and gagged or cited for contempt. Subsequent to the trial, the Supreme Court, reversing the Court of Appeals, held that an obstreperous defendant could be removed from the courtroom, although it also approved binding and gagging as an alternative. Illinois v. Allen, 397 U.S. 337, 343–346, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

10. The evidence is in dispute as to whether at least one of the marshals punched Seale in the midriff.

11. Mr. Weinglass: Your Honor, will you rule on my motion? I made a motion to voir dire this jury.
The Court: The form of the motion is bad; therefore I deny it.
Mr. Weinglass: May I have an opportunity to rephrase the form of the motion?
The Court: No. (Tr. 4,844).

12. Hoffman II recites that Hoffman refused to rise when the court recessed. The government states that the specification includes this fact only for the purpose of demonstrating Hoffman's lack of respect for the court. The government does not charge this conduct as contempt.

The essence of the charge against the defendants in these specifications is that their comments "fanned the flames" of disorder in the courtroom and caused such a disruption of the proceedings as materially to obstruct the administration of justice. But the official transcript, the tapes and the testimony of eyewitnesses demonstrate that the trial proceedings had so disintegrated on the morning of October 30 that no judicial proceeding could fairly be said to be in progress.[13] The record further shows that the principal cause of this disintegration was the appalling spectacle of a bound and gagged defendant and the marshals' efforts to subdue him. The evidence does not establish beyond a reasonable doubt that the conduct charged to these defendants in these specifications was the cause of the breakdown of the proceedings or occasioned an actual and material obstruction of the administration of justice.

*Dellinger III, Hoffman IV (November 26)*

On the morning of November 26, before the jury was called into the courtroom, Mr. Weinglass argued in support of a motion for a writ of habeas corpus ad testificandum for the production of one John Sinclair, in prison in Michigan, to testify on behalf of the defendants. After extended argument, the judge read into the record his opinion denying the motion. Mr. Kunstler, stating that the defendants regarded Sinclair as a key witness and were extremely disturbed by the denial of the motion, requested a recess so that they might consult. The court denied the request for a recess, and Dellinger made the remarks attributed to him in Dellinger III. Shortly thereafter, the jury was brought into the courtroom. The judge directed the government attorneys to call their next witness, but a short delay ensued as the witness was not immedi-

ately available. While the court was waiting for the witness, Mr. Kunstler renewed his request for a recess, which was again denied by the judge. At this point, Hoffman interjected the comments set forth in Hoffman IV. Once again, Mr. Kunstler renewed his request for a recess and the request was denied. The government witness then arrived in the courtroom, and the examination proceeded.

The record does not show that the conduct charged to these defendants in these specifications, while clearly misbehavior, caused any such delay or other disruption of the proceedings as to constitute an actual and material obstruction of the administration of justice.

*Davis V, Hoffman V, Rubin IV (February 4)*

At the end of the afternoon session on February 4, the judge excused the jury, but asked the parties and counsel to remain. He then read a brief ruling into the record and announced that he was terminating Dellinger's bail because of his use in the courtroom of "vile and insulting language." (*See* Dellinger X). Mr. Kunstler requested an opportunity to argue the question. The judge denied argument. This event prompted an outburst from the spectators.[14] The marshals started to remove people from the courtroom, and pandemonium broke out. At this point, Mr. Kunstler interrupted his attempt to argue the revocation of Dellinger's bail, and there ensued the colloquy, participated in by Davis, Hoffman and Rubin, which forms the substance of Davis V, Hoffman V and Rubin IV. (*See also* Kunstler VIII). The marshals eventually cleared the courtroom, and the judge proceeded to another case.

These specifications charge in substance that the comments of these defendants caused such a disruption of the

---

13. *See* United States v. Dellinger, *supra*, 461 F.2d at 385.

14. The evidence is in dispute as to whether this was one of the occasions when Dellin-

ger's daughters, who frequently attended the trial, became disruptive and had to be removed from the courtroom.

proceedings as materially to obstruct the administration of justice. But the official transcript, the tapes and the testimony of eyewitnesses demonstrate that it was the disorder among the spectators following the judge's abrupt order revoking Mr. Dellinger's bail and his refusal to hear any argument which caused the complete disintegration of the trial proceedings at the close of the afternoon session on February 4. The conduct charged to these defendants in these specifications clearly constituted misbehavior with the requisite intent. However, the evidence does not establish beyond a reasonable doubt that defendants' conduct caused the delay and disruption of the proceedings so as to constitute an actual and material obstruction of the administration of justice.

Applying the standards which have been set forth above to the contempt specifications against the non-lawyer defendants, the Court finds that, for the reasons to be stated, these defendants are guilty of the following charges:

*Dellinger IV (December 9)*

■ On the afternoon of December 9, in the absence of the jury, the judge interrupted a colloquy with counsel to note that certain of the defendants, particularly Dellinger, were making noises. Dellinger denied that he had made a single noise. When the judge persisted in the accusation, Dellinger responded with the remarks attributed to him in Dellinger IV, calling the judge "a liar," "a facist court," "absolutely irresponsible" and "dishonest." At the conclusion of Dellinger's remarks, Mr. Kunstler asserted Dellinger's right to deny a false accusation. A brief colloquy ensued and the jury was recalled to the courtroom.

The record does not permit the Court to find beyond a reasonable doubt that Dellinger had made noises as charged by the judge.[15] But, even if the judge was mistaken and the false accusation justified Dellinger's denial, his vilification of the judge was an excessive and wholly unwarranted response, which could only have served "to vent the speaker's spleen." In light of the extent of his comments and their offensive character, it is clear that he knew or should reasonably have been aware that his conduct was wrongful. The record further shows that this interruption of the legal argument in which the judge and counsel were engrossed so disrupted the course of the proceedings that an unnecessary and not insubstantial delay ensued. The Court is compelled to conclude that the conduct charged to Dellinger in this specification constituted misbehavior in the presence of the court demonstrating the requisite intent and arising to the level of an actual and material obstruction of the administration of justice.

*Dellinger V (December 15), Dellinger VI (December 30), Dellinger VII (January 12), Dellinger VIII (January 14), Dellinger IX (January 23), Dellinger X (February 4)*

■ *Dellinger V.* On the afternoon of December 15, with the jury present in court, Mr. Weinglass was examining the witness MacKenzie. The judge interrupted an argument on the admissibility of an exhibit to ask the marshals to remove from the courtroom Mr. Stuart Ball, Jr. for laughing at the judge. Ball was a young lawyer who, although not formally appearing as counsel, was assisting in the defense effort.[16] Mr.

---

15. On Monday, December 15, defendants filed the affidavits of Froines and a law student stating that Dellinger had made no noise. (Tr. 11,092–93).

16. On the Saturday before the start of the trial, Mr. Ball, at Mr. Kunstler's request, had appeared before the judge to file an emergency motion for leave for a represent-

ative of the defense to interview Seale in the Cook County jail. At the time, Mr. Ball had taken the bar examination for admission to the District of Columbia bar, but had not yet been admitted. The judge castigated him roundly for appearing when not yet a member of the bar and denied the motion (Tr. Sept. 20 pp. 8–9). During the remainder of the trial, Mr. Ball, without actively

Weinglass stated that Ball did not laugh, and Hoffman and Davis both indicated that they had laughed. The judge again directed the marshals to remove Ball. There then ensued the colloquy set forth in Dellinger V, in which Dellinger termed the removal of Ball "an injustice," accused the judge of lying and of being "very prejudiced and unfair," and called the judge "the assistant prosecutor or maybe the chief prosecutor." Disorder, punctuated with cheers of "Right on" resulted from the spectators.

*Dellinger VI.* On the morning of December 30, during the direct examination of defendant Hoffman, the jury being present in court, the judge sustained a government objection to a question asked by Mr. Weinglass. Dellinger reacted with a loud groan and sigh, which attracted the attention of a marshal. There ensued a colloquy between the court, counsel and Dellinger, in which Dellinger repeatedly expressed his disgust with the court's ruling and his contempt for the "dishonesty" of the court's process. This colloquy is the subject matter of Dellinger VI.

*Dellinger VII.* On the afternoon of January 12, the jury not being present, the judge sustained a government objection to a defense exhibit, and Dellinger commented, "Oh, ridiculous." Although apparently made to Froines at the defense table, the remark was overheard by the judge and precipitated the colloquy set forth in Dellinger VII, in which Dellinger called the judge "a hypocrite," again accused the judge of unfairness and of discrediting the whole system of justice, and continued speaking after the judge ordered him to remain quiet.

*Dellinger VIII.* On January 14, during the redirect examination of the witness Edmundson, the jury being present, the judge sustained the government's objection to a question asked of the witness by Mr. Weinglass. Apparently someone at the defense table laughed, and there ensued the colloquy set forth in Dellinger VIII, during the course of which Dellinger repeatedly called the judge a liar and refused to be quiet after the judge directed him to sit down. At the conclusion of Dellinger's remarks, spectators and others applauded, and there was further colloquy between the judge, the defendants and their counsel before Mr. Weinglass resumed his questioning of the witness.

*Dellinger IX.* On the morning of January 23, during the direct examination of defendant Davis, the jury being present, the judge sustained the government's objection to a defense exhibit. Argument over the judge's ruling precipitated a motion by Mr. Kunstler for a mistrial.[17] The judge's denial of the motion resulted in the colloquy set forth in Dellinger IX, during the course of which Dellinger accused the court of "force and violence," of "inciting a riot" and of "hypocrisy"; again called the judge "the chief prosecutor"; stated there was "no pretense of fairness" in the court; and refused to be quiet after the judge repeatedly ordered him to sit down. Disorder broke out in the courtroom. The marshals removed several spectators, and there was substantial further colloquy between the judge, the defendants and their counsel before the examination of the witness was resumed.

*Dellinger X.* On the morning of February 4, during the direct examination of the government's rebuttal witness Riordan, the jury being present, the witness testified to alleged activity of Dellinger. This prompted the barnyard epithet from Dellinger and the further colloquy set forth in Dellinger X. During the course of the colloquy, Dellinger stated that the witness' testimony was "an absolute lie," called the prosecuting

participating in the proceedings, assisted Mr. Kunstler and Mr. Weinglass in the preparation of defense witnesses.

17. The basis of Mr. Kunstler's mistrial motion was the court's comment in the presence of the jury that if Mr. Kunstler was concerned about the welfare of his clients, he could bring them on if he liked (Tr. 17,370). Mr. Kunstler argued that this remark was in derogation of defendants' Fifth Amendment right not to testify.

attorney "a snake" and a liar, and accused the judge of prejudice. Shouts of "Damn right" and "Right on" ensued from the spectators. All comments attributed to this defendant in this specification, other than the last one, were made before the jury had departed the courtroom.

\* \* \* \* \* \*

On each of the occasions which are the subject of the foregoing specifications, Dellinger was adequately represented by counsel and had no reason to interject himself into the proceedings. He admits that the judge had repeatedly warned the defendants to speak only through their lawyers and that he was speaking in direct violation of the court's directives.[18] Thus, his unwarranted participation constituted misbehavior, which, by his own admission, he knew was wrongful. The evidence further establishes that on each occasion his comments occasioned an entirely unnecessary and not insubstantial delay in the proceedings and that his vilification of the judge could only have served "to vent the speaker's spleen." The record clearly shows that the conduct charged to Dellinger in each of these specifications constituted misbehavior in the presence of the court with the requisite intent and rose to the level of an actual and material obstruction of the administration of justice.

*Hoffman VI, Rubin V (February 5)*

■ The morning session on February 5 opened with an extended argument by Mr. Weinglass, in the absence of the jury, in support of a motion to reinstate Dellinger's bail. The judge's statement that he had been very patient with defendants and their counsel during the nearly five and one-half months of the trial prompted the remarks attributed to Rubin in Part I of Rubin V. Shortly thereafter, the judge terminated the argument before Mr. Weinglass had concluded and denied the motion. Following a brief colloquy, in which Mr. Kunstler joined, Hoffman and Rubin interjected the comments attributed to them in Part I of Hoffman VI and Part II of Rubin V. The jury was then returned, and government counsel completed the direct examination of the rebuttal witness Lawyer. Prior to cross-examination of the witness the jury was excused so that defense counsel might examine Jencks Act material. While this was being done, Mr. Weinglass attempted to renew his argument for Dellinger's reinstatement to bail. The judge refused to hear further argument from either Mr. Weinglass or Mr. Kunstler and ordered both to sit down. At this juncture, Hoffman and Rubin made the remarks attributed to them in Part II of Hoffman VI and Part III of Rubin V. Shortly thereafter, when the judge refused to sign the written order revoking Dellinger's bail, Rubin made the further comment charged to him in Part IV of Rubin V. The morning session closed with the comments attributed to these defendants in Part III of Hoffman VI and Part V of Rubin V.

Hoffman and Rubin were adequately represented by counsel, and they had no reason to interject themselves into the proceedings. The judge had repeatedly warned both that they were to speak only through counsel. In light of the unwarranted and vilifying character of their remarks, these defendants clearly knew or should reasonably have been aware that their conduct was wrongful, and the record plainly discloses that their persistent interjections occasioned a substantial delay in the progress of the proceedings. The conclusion is inescapable that the conduct charged to Hoffman and Rubin in these specifications constituted outrageous misbehavior in the presence of the court, that the de-

---

18. Dellinger testified and argued that he felt "compelled" to protest the judge's actions because of his conviction that the trial had become a "non-trial" and that the defendants were being "railroaded," and thus that his repeated interjections were "appropriate in the circumstances." But the law is clear that the motivation of one who engages in conduct inappropriate to his role in the courtroom cannot excuse contemptuous misbehavior. *See* pp. 1308–1309, *supra.*

fendants acted with the requisite intent, and that their conduct rose to the level of an actual and material obstruction of the administration of justice.

*Hoffman VII, Rubin VI (February 6)*

On February 6, shortly after the morning session of court was called to order, the jury not being present, Hoffman and Rubin entered the courtroom wearing judicial robes to which were attached six-pointed Jewish stars. Shortly thereafter, while leaving the courtroom during a recess, Hoffman removed his robes, dropped them to the floor and walked over them. Underneath the robes he was wearing a Chicago policeman's shirt. Both defendants testified that their conduct was "guerrilla theater" and "symbolic communication" of their contempt for the judge and the judicial process, as well as their view that judicial robes were simply a cloak for police brutality.

Concededly, the record does not disclose that the conduct charged to these defendants in these specifications caused any substantial disruption of the proceedings. However, as the Court of Appeals has stated, "the seriousness of the misbehavior bears on what conduct may be found materially obstructive." *Seale*, 461 F.2d at 369. The conduct charged here was so flagrant, so outrageous, and so subversive of both respect for the court and the integrity of the judicial process as to rise to the level of an actual and material obstruction of the administration of justice. The transcript further discloses that the conduct occasioned an entirely unnecessary and not insignificant delay in the proceedings. From the entire record, the conclusion is inescapable that the conduct charged to Hoffman and Rubin in these specifications constituted clear misbehavior in the presence of the court, that these defendants knew or should reasonably have been aware that their conduct was wrongful, and that their conduct constituted an actual and material obstruction of the administration of justice.

B. *Lawyer Defendants*. With respect to each of the contempt specifications against the lawyer defendants, the Court must determine whether the evidence establishes beyond a reasonable doubt that the defendant's conduct constituted misbehavior with the requisite intent in the presence of the court which rose to the level of an actual and material obstruction of the administration of justice. The essential elements of the crime of contempt as they have been defined by the Court of Appeals in *Seale* apply. *Dellinger*, 461 F.2d at 397; *Oliver*, 470 F.2d at 12. It must "'clearly be shown' from the record that . . . [the attorney's] conduct rose to the level of contemptuous 'misbehavior' which 'obstructed' the judge in performance of judicial duty." *Oliver* at 12; *Dellinger*, 461 F.2d at 397. *See also* In re McConnell, 370 U.S. 230, 234, 82 S.Ct. 1288, 8 L.Ed.2d 434 (1961). In addition,

> where, as here, the conduct complained of is that of an attorney engaged in the representation of a litigant, the search for these essential elements of the crime of contempt must be made with full appreciation of the contentious role of trial counsel and his duty of zealous representation of his client's interests. *Dellinger*, 461 F.2d at 397; *Oliver*, 470 F.2d at 12.

In dealing with the conduct of attorneys, in both *Dellinger* and *Oliver*, the court also quoted with approval the language of the Supreme Court in *McConnell*, *supra*, 370 U.S. at 236, 82 S.Ct. 1288, 8 L.Ed.2d 434:

> [W]hile we appreciate the necessity for a judge to have the power to protect himself from actual obstruction in the courtroom . . . it is also essential to a fair administration of justice that lawyers be able to make honest good-faith efforts to present their clients' cases. An independent judiciary and a vigorous, independent bar are both indispensable parts of our system of justice. To preserve the kind of trials that our system envisages, Congress has limited the summa-

ry contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice. *Dellinger*, 461 F.2d at 397; *Oliver*, 470 F.2d at 13.

■ With respect to the requisite intent, the Court of Appeals has further stated that attorneys may be ". . . persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious, when acting in their client's behalf," *Dellinger*, 461 F.2d at 400, and that ". . . an attorney possesses the requisite intent only if he knows or reasonably should be aware in view of all the circumstances, especially in the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth." *Idem.*

■ In sum, attorneys must be given "great latitude" and "extreme liberality" in the area of vigorous advocacy, and doubts in delineating the line between vigorous advocacy and obstruction are to be resolved in favor of advocacy.

*Dellinger* at 398; *Oliver*, 470 F.2d at 13. As the Supreme Court stated in *McConnell*,

> The arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty. 370 U.S. at 236, 82 S.Ct. at 1292.

In *Dellinger* and *Oliver*, the Court of Appeals has set forth certain types of conduct by attorneys which do and do not rise to the level of contemptuous misbehavior constituting an actual and material obstruction. *See generally Dellinger*, 461 F.2d at 397–401; *Oliver*, 470 F.2d at 13–14:

■ (1) Attorneys may not persist in continuing argument after express orders by the trial judge to cease. *Dellinger*, 461 F.2d at 398. "[T]he necessity for orderly administration of justice compels the view

that the judge must have the power to set limits on argument." *Id.* at 399. Nor is good faith an absolute defense to a contempt citation for persistent argument, even though the attorney has not been given a reasonable opportunity to be heard. *Dellinger* at 398. On the other hand, ". . . without an actual obstruction, there can be no contempt." *Idem.* "And where the judge is arbitrary or affords counsel inadequate opportunity to argue his position, counsel must be given substantial leeway in pressing his contention . . . ." *Id.* at 399.

(2) When, despite a court directive to cease argument, the trial judge adds a rejoinder or a statement which calls for a response by the attorney," an invited, additional response cannot subsequently be viewed as a contemptuous violation of the order." *Idem.*

■ (3) An attorney is permitted to reply when the judge has charged him with professional misconduct; he ". . . may insist upon being heard in his own defense so long as his response is respectful." *Idem.* But, while the attorney may respond to such an attack, "[e]ven if the judge's accusation be unfounded, or ill-tempered, it does not protect counter-misbehavior . . . ." *Idem.*

■ (4) An attorney has no affirmative obligation to restrain his client from disruptive conduct; he commits contempt, however, if he encourages disruptive behavior by a client or ". . . fans the flames of existing frictions . . . ." *Id.* at 399–400. Unless the attorney's conduct is the occasion for disruptive conduct by others in the courtroom, the attorney cannot be held responsible for that conduct. *Oliver*, 470 F.2d at 13.

(5) "[M]ere disrespect or insult cannot be punished where it does not involve an actual and material obstruction. This is particularly true with respect to attorneys where the

'heat of courtroom debate' may prompt statements which are ill-considered and might later be regretted." *Dellinger,* 461 F.2d at 400. When, however, the attorney's remarks "create an imminent prejudice to a fair and dispassionate proceeding," the "line beyond which disrespect becomes obstruction" is crossed. *Idem.* Moreover, a material obstruction exists "if an entirely unnecessary and not insignificant delay is occasioned by insulting remarks which serve, for instance, only to vent the speaker's spleen . . . ." *Idem.* The manner in which the remark was made may also be significant. *Idem.*

Finally, it must be reiterated that, as the Court of Appeals made clear in both *Seale* and *Dellinger,* ". . . impropriety on the part of the trial judge cannot justify or excuse contemptuous conduct. However, judicial (or prosecutorial) provocation is to be considered . . . in extenuation of the offense and in mitigation of any penalty to be imposed." *Dellinger,* 461 F.2d at 401. *See Seale,* 461 F.2d at 361–364.

Bearing in mind the "great latitude" and "extreme liberality" afforded trial counsel when acting in their client's behalf, and resolving any doubts in favor of vigorous advocacy, the Court finds that, for the reasons to be stated, the defendants Weinglass and Kunstler are not guilty of the following charges:

### Kunstler I (October 30)

This specification charges Mr. Kunstler with failing to assist the court in maintaining order and with encouraging further disorder in the courtroom on the second day when Seale was bound and gagged. An attorney has no obligation to restrain others in the courtroom from disruptive conduct. *See Dellinger,* 461 F.2d at 399. Nor does the record disclose that Mr. Kunstler's comments caused disorder or aggravated the existing disorder in the courtroom. For these reasons, as well as for the reasons stated by the Court in its discussion of Davis II, Hayden III and Hoffman II, *supra,* the Court cannot say that the evidence establishes beyond a reasonable doubt that the conduct charged to Mr. Kunstler in this specification occasioned an actual and material obstruction of the administration of justice. Nor does the evidence establish beyond a reasonable doubt that such conduct constituted misbehavior with the requisite intent.

### Kunstler IV (January 6)

On January 6, the defendants called Mayor Richard J. Daley of Chicago to the stand as their witness. After the court had sustained objections to a series of leading questions asked of Mayor Daley by Mr. Kunstler, Mr. Kunstler moved to have the mayor declared a hostile witness. The motion was made in the presence of the jury despite the court's direction to counsel, in an earlier colloquy in the absence of the jury, that any motion to have the mayor declared a hostile witness be made outside the presence of the jury (Tr. 13,890). This specification charges Mr. Kunstler with a direct violation of the court's order.

After a careful review of the record, the Court cannot say that it is satisfied beyond a reasonable doubt that Mr. Kunstler deliberately and intentionally acted in violation of the court's order or that the incident occasioned an actual and material obstruction of the administration of justice. Mr. Kunstler testified that he understood the court's order to prohibit *arguing* a hostile witness motion in the presence of the jury. The order was somewhat ambiguous, and the transcript discloses that, as soon as government counsel called the court's attention to the alleged violation, Mr. Kunstler requested several times unsuccessfully that the jury be excused. A substantial amount of time had elapsed since the court's direction to counsel, and, most significantly, the motion could not conceivably have prejudiced the jury, inasmuch as the hostility existing between Mayor Daley and the defendants was obvious to everyone in the courtroom. *See* United States v. Dellinger, *supra* at 388, n. 86.

**1318**

*Kunstler V (January 23)*

On the morning of January 23, during the direct examination of defendant Davis, with the jury present in court, the judge sustained the government's objection to a defense exhibit. Argument over the judge's ruling precipitated a motion by Mr. Kunstler for a mistrial.[19] The judge's denial of the motion resulted in the colloquy set forth in Dellinger IX. Disorder broke out in the courtroom, and the marshals moved to the rear of the courtroom and started ejecting a number of spectators who had applauded Dellinger's remarks and were otherwise disrupting the proceedings. At this point, Mr. Kunstler, who was at the lectern attempting to argue the admissibility of the exhibit, made the comments charged to him in Kunstler V.

The charge against Mr. Kunstler in this specification is that his commentary from the lectern "had the effect of encouraging disorder among the spectators." However, the transcript, the tapes and the testimony of eyewitnesses show that the disorder among the spectators had resulted from the immediately preceding remarks of Mr. Dellinger and from the efforts of the marshals to remove the spectators who had applauded. The evidence does not establish beyond a reasonable doubt that Mr. Kunstler's comments from the lectern caused the disruptive conduct of others in the courtroom or occasioned an actual and material obstruction of the administration of justice.

*Weinglass III (January 24)*

On the afternoon of January 24, during the direct examination of defendant Davis, with the jury present in court, the judge sustained a government objection to testimony by the witness concerning a speech of the Reverend Ralph Abernathy given at one of the National Mobilization Committee (MOBE) rallies which had been held on August 29, 1968.[20] After the court's initial ruling, Mr. Weinglass and Mr. Kunstler continued to argue that the speech given by Dr. Abernathy, who at the time was national co-chairman with Mr. Dellinger of MOBE, was directly relevant to demonstrate the non-violent intent of the defendants.[21] Government counsel responded, and the judge announced that his ruling would stand. Despite repeated directions from the judge to continue his examination of the witness, Mr. Weinglass continued to argue as set forth in Weinglass III.

The essence of the charge against Mr. Weinglass in this specification is that he persisted in continuing argument after repeated orders by the judge to cease. But it is clear from the relevant transcript and tapes that Mr. Weinglass sincerely believed that the judge had not given him a reasonable opportunity to be heard and did not fully understand his position. *See Dellinger* at 399. Mr. Weinglass' remarks were confined to argument and he did not personally insult or otherwise show disrespect for the judge. There is no indication in the transcript or the tapes that his statements were made in an offensive manner or in any way disrupted the proceedings. *See In re Little*, 404 U.S. 553, 92 S.Ct. 659, 30 L.Ed.2d 708 (1972). As the Court of Appeals has stated, attorneys may be ". . . persistent, vociferous, contentious, and imposing, even to the point of appearing obnoxious, when acting in their client's behalf," *Dellinger*, 461 F.2d at 400, but, "an attorney possesses the requisite intent only if he knows or reasonably should be aware

---

19. *See* n. 17, *supra.*

20. One of the overt acts charged in the Anti-Riot Act indictment was an alleged conversation between two of the defendants at a MOBE rally held during the forenoon of August 29. The government's position, sustained by the court, was that Dr. Abernathy's speech was irrelevant because it had been given at another rally later that day, which was not one of the overt acts charged in the indictment.

21. The defendants' position was that Dr. Abernathy's speech was fully as relevant to show the intent of the defendants as was a speech given by Senator McCarthy at the same rally concerning which defense witness Goodwin had previously been permitted to testify.

in view of all the circumstances, especially in the heat of controversy, that he is exceeding the outermost limits of his proper role and hindering rather than facilitating the search for truth." *Idem.* The Court cannot say that the record "clearly shows" that the conduct charged to Mr. Weinglass in this specification was conduct "so inappropriate to . . . [his] role as trial counsel" as to exceed the "outermost limits" of vigorous advocacy, or that such conduct rose to the level of contemptuous "misbehavior" which "obstructed" the judge in "the performance of judicial duty." In the view of this Court, while Mr. Weinglass approached the brink, he did not cross the line between advocacy and obstruction.

### Kunstler VIII (February 4)

▮ This specification charges Mr. Kunstler with "fanning the flames of the disorder" which had broken out in the courtroom at the end of the afternoon session on February 4 when the judge revoked Dellinger's bail. The record does not show, however, that Mr. Kunstler's comments either caused or aggravated the existing disorder in the courtroom. For this reason, as well as for the reasons stated by the Court in its discussion of Davis V, Hoffman V and Rubin IV, *supra,* the Court cannot say that the evidence establishes beyond a reasonable doubt that the conduct charged to Mr. Kunstler in this specification occasioned an actual and material obstruction of the administration of justice.

Applying the standards which have been set forth above to the contempt specifications against the lawyer-defendants, the Court finds that, for the reasons to be stated, defendant Kunstler is guilty of the following charges:

### Kunstler VI (February 2)

▮ On Friday, January 30, Mr. Kunstler represented to the court that the defendants had completed the presentation of their "live" witnesses. He requested and obtained a weekend recess so that the defense might locate a cameraman necessary to authenticate a film, the admission of which, together with certain documents, would conclude the defense case. On Monday morning, February 2, Mr. Kunstler informed the judge that over the weekend the defendants had learned that the Reverend Ralph Abernathy had returned to the United States from Europe and would be available to testify later that morning. Mr. Kunstler asked to be relieved of his prior commitment in view of this unforeseen development. The government objected, and the judge denied Mr. Kunstler's motion. At this point, Mr. Kunstler made the extended remarks set forth in Kunstler VI. In the course of these comments, he termed the judge's ruling "about the most outrageous statement I have ever heard from a bench," violating "every principle of fair play;" stated that he felt "disgraced to be here" and that the judge could hold him in contempt if he wished to do so; accused the judge of extreme bias; documented his accusations with a quotation from *The New York Times* which had characterized a prior ruling of the judge as "the ultimate outrage in American justice"; called the trial "a legal lynching"; and concluded with the following observation:

> —and that, your Honor, is wholly responsible for that, and if this is what your career is going to end on, if this is what your pride is going to be built on, I can only say to your Honor, "Good luck to you."

Shouts of "Right on" and applause followed.

Mr. Kunstler testified that his remarks constituted "forceful and vigorous" argument. However, the extent and violence of the diatribe and the bitterness and anger expressed demonstrate that his comments constituted a vicious personal attack on the judge which could only have served to vent his spleen. His remarks plainly created an "imminent prejudice to a fair and dispassionate proceeding." *See Dellinger,* 461 F.2d at 396. Unquestionably, the line "beyond

which disrespect becomes obstruction" was crossed. The record clearly shows that the conduct charged to Mr. Kunstler in this specification constituted outrageous misbehavior in the presence of the court; that, as the speech itself indicates, Mr. Kunstler knew his conduct was wrongful; and that the conduct, which resulted in an entirely unnecessary and not insignificant delay and disruption of the proceedings, exceeded the "outermost limits" of advocacy and rose to the level of an actual and material obstruction of the administration of justice.

*Kunstler VII (February 2)*

 On the morning of February 2, following the judge's denial of Mr. Kunstler's motion for leave to present the Reverend Ralph Abernathy as a defense witness (*see* Kunstler VI), the judge called on the defendants either to present further evidence or to rest. Mr. Kunstler stated that the defendants were not going to rest, as Dr. Abernathy was on his way from the airport and prepared to testify. Over Mr. Kunstler's objection, the judge rested for the defendants. At the request of government counsel, the judge ordered the defendants and their counsel to make no reference before the jury to the fact that they wanted Dr. Abernathy to testify. There ensued the colloquy set forth in Part I of Kunstler VII, in which Mr. Kunstler stated that he was not going to abide by the court's order; that he was going to repeat his motion before the jury; and that the judge would have to send him to jail. The jury then returned to the courtroom, and the judge informed the jury that since the defendants were not ready to proceed, he had rested for them. Mr. Kunstler objected and informed the jury that the defendants were prepared to go ahead with Dr. Abernathy. Shortly thereafter, Mr. Kunstler interrupted the examination of the government's first rebuttal witness to inform the court that Dr. Abernathy had just arrived. There then ensued, in the presence of the jury, the colloquy set

forth in Part II of Kunstler VII, during which Mr. Kunstler renewed his motion to call Dr. Abernathy as a defense witness and persisted in arguing the motion after it had been denied by the judge and after the judge had repeatedly ordered him to sit down.

The record clearly shows that Mr. Kunstler flagrantly and defiantly violated the court's order not to renew his motion in the presence of the jury and persisted in continuing argument after the judge's repeated directions to stop. His conduct exceeded the "outermost limits" of vigorous advocacy and constituted contemptuous misbehavior which he assuredly knew or reasonably should have been aware was wrongful. His actions plainly caused a substantial delay in the proceedings and obstructed the judge in the performance of his judicial duty.

## II

### EXTENUATION AND MITIGATION

The Court of Appeals made clear in *Seale* and *Dellinger* that impropriety on the part of the trial judge cannot justify or excuse contemptuous conduct. However, the Court of Appeals made equally clear in those cases that judicial error, judicial or prosecutorial misconduct, and judicial or prosecutorial provocation are to be considered in extenuation of the offense and in mitigation of any penalty to be imposed. *Dellinger,* 461 F.2d at 401; *Seale,* 461 F.2d at 361–364. *See* Cooke v. United States, 267 U.S. 517, 537, 45 S.Ct. 390, 69 L.Ed. 767 (1925); Offutt v. United States, 93 U.S.App.D.C. 148, 208 F.2d 842, 843 (1953). Therefore, this Court must now consider the extent to which the conduct of the trial judge and prosecuting attorneys in the Anti-Riot Act trial, although it cannot vitiate the contempt convictions, may reduce the degree of the defendants' culpability and lessen the severity of the penalties which might otherwise be imposed.

In reversing the Anti-Riot Act convictions of five of the original defendants, the Court of Appeals reviewed in detail

the bizarre events of that trial. United States v. Dellinger, *supra*. Its review, which is confirmed by the transcript, the tapes and the eyewitness testimony presented to this Court, revealed a trial which lasted four and a half months, requiring 103 trial days. Spectators and press personnel filled the courtroom daily, and, at times, there were as many as 19 marshals in the courtroom. Almost every session was punctuated by spectator disorder and outbursts and by recriminatory exchanges between the judge and prosecutors, on the one hand, and the defendants and their counsel, on the other. During several sessions from October 29 to November 3, Seale was bound and gagged in the courtroom.. On a number of occasions, the trial so completely disintegrated that it could not be said that a judicial proceeding was in progress. The Court of Appeals concluded that "we are unable to approve the trial in this case as· fulfilling the standards of our system of justice." *Id.* 461 F.2d at 385.

Although the Court of Appeals made no attempt to assign responsibility for the deficiencies in the trial, *id.* at 385, it held that "the demeanor of the judge and prosecutors would require reversal if other errors did not." *Id.* 461 F.2d at 391. Among other improprieties, the Court of Appeals noted several hundred comments and actions of the trial judge, more than 150 in the presence of the jury, which, from the very beginning, displayed the judge's "deprecatory and often antagonistic attitude" toward the defendants, their counsel and their case, and which "must have telegraphed to the jury the judge's contempt for the defense." *Id.* at 386–389, and nn. 80, 83, 84 and 86. In addition, the Court of Appeals catalogued numerous instances in which the judge's manifest hostility toward the defense was disclosed by unwarranted restrictions on the activities of defense counsel and the conduct of the defense, *id.* at 386–387 and nn. 81 and 82; inconsistent evidentiary rulings, *id.* at 387 and nn. 86 and 88; and the harassment of defense witnesses, *id.* at 388 and n. 85. Finally, the Court of Appeals observed that the conduct of the prosecutors, which included numerous disparaging personal attacks on defense counsel made before the jury, "fell below the standards applicable to a representative of the United States." *Id.* at 389 and n. 87. The official transcript, the tapes and the eyewitness testimony presented before this Court amply support these findings of the Court of Appeals.

From the foregoing, it is apparent that the contumacious conduct of the defendants and their lawyers cannot be considered apart from the conduct of the trial judge and prosecutors. Each reacted to provocation by the other, and the tensions generated during four and a half months of so acrimonious a trial cannot be ignored. Indeed, with the exception of the two specifications relating to the "robe" incident (Hoffman VII and Rubin VI), the contumacious conduct of the four remaining defendants can, in each instance, reasonably be said to have been in response, albeit an excessive response, to peremptory action of the judge.

. [31] Present government counsel urge that substantial jail sentences for these defendants are necessary to vindicate the judicial process and to deter other defendants and defense counsel from similar misbehavior.[22] After a careful evaluation of the record, however, this Court is convinced that, in the particular circumstances here present, the affirmation of the integrity of trial proceedings and the goal of deterrence have both been achieved by the findings of guilt. The Court is further persuaded that, at this late date, four years aft-

22. The theory of the government's case was, in substantial part, that the defendants came to the Anti-Riot Act trial intent upon its destruction. Counsel argue that the sentences here imposed should reflect this particularly culpable design. *Seale*, 461 F.2d at 268–269. This Court, however, is unable to find that the evidence establishes beyond a reasonable doubt the existence of any such plan.

er the events which gave rise to these charges, no warrant exists for the imposition of jail sentences additional to the periods of imprisonment which have already been served by the non-lawyer defendants.[23] While Mr. Kunstler was never incarcerated, in the considered judgment of the Court, no purpose, other than the impermissible purpose of vindictiveness, would be served by sentencing him to prison at this time. The condemnation of his conduct and the potentially grave consequences of a criminal contempt conviction to a member of the bar should serve as adequate deterrents to other lawyers who may be disposed to similar misbehavior.

In light of the unique character and long history of this case, and the defendants' attack on the integrity and fairness of the American judicial process, a concluding observation is appropriate. Throughout these proceedings, the defense has asserted that both the 1969 Anti-Riot Act prosecution and the present contempt proceedings have been "political trials" designed to suppress dissent. This position, they claim, gives them license unilaterally to dispense with the standards of civility to which American lawyers and litigants customarily adhere in criminal, as well as civil, trials. It is precisely to preserve the opportunity for the fair and dispassionate resolution of strenuously contested disputes by an impartial tribunal that rules governing the behavior of all the actors in a trial exist. The fallacy which this Court perceives in the defendants' reasoning was exposed by the Court of Appeals in *Seale* in the following language, drawn in large part from opinions of the Supreme Court:

"It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." Illinois v. Allen, *supra*, 397 U.S. 337 at 343, 90 S.Ct. 1057, 25 L. Ed. 353. "Preservation of the liberties of citizens, when on trial for crimes charged against them, demands order in the courtroom. Absent such order, no trial can be fair. More important, if criminal trials cannot go on in orderly fashion, then the defendants, if unpopular or if members of minority groups, may become the victims of that monstrous substitute for ·trials—mob violence." United States v. Sacher, *supra*, 182 F.2d 416 at 454 (concurring opinion of Judge Frank). It is precisely because appellate courts sit to vindicate error that this principle is viable. Thus it is that he who would make himself the "judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion," (Walker v. City of Birmingham, *supra*, 388 U.S. 307 at 320–321, 87 S.Ct. 1824 at 1832, 18 L.Ed.2d 1210), and who would resort to appeal by disruption in the courtroom commits "the most grievous of offenses—a crime against intelligence." Freund, *supra* at 9. *Seale* at 362–363.

In sum, a courtroom ". . . is a place for ·trial of defined issues in accordance with law and rules of evidence, with standards of demeanor for court, jurors, parties, witnesses and counsel." *Dellinger*, 461 F.2d at 401 (quoting from Katz v. Murtagh, 28 N.Y.2d 234, 240, 321 N.Y.S.2d 104, 269 N.E.2d 816, 820 (1971)).

Trials which proceed in accordance with the law, the rules of evidence and the standards of demeanor not only reaffirm the integrity and viability of the judicial process, but also serve to insure the ability of each one of us to protect

---

23. Hoffman was sentenced for contempt on February 14, 1970 and remained incarcerated for 15 days until released by order of the Court of Appeals on February 28, 1970. Rubin was sentenced for contempt on February 15, 1970 and remained incarcerated for 14 days until released by order of the Court of Appeals on February 28, 1970. Dellinger has served a total of 24 days: 10 days during the trial following revocation of his bail on February 4, 1970 and 14 days from imposition of his contempt sentence on February 14, 1970 until he was released by the Court of Appeals on February 28, 1970.

the rights and liberties we enjoy as citizens. The point is well made by the following dialogue which comes, not from a judicial opinion or a legal treatise, but from Robert Bolt's play, "A Man For All Seasons." The dialogue is between Sir Thomas More and his son-in-law, William Roper, a young lawer:

Roper: So now you'd give the Devil benefit of law!

More: Yes. What would you do? Cut a great road through the law to get after the Devil?

Roper: I'd cut down every law in England to do that!

More: Oh? And when the last law was down, and the Devil turned round on you—where would you hide, Roper, the laws all being flat? This country's planted thick with laws from coast to coast— man's laws, not God's—and if you cut them down—and you're just the man to do it—d'you really think you could stand upright in the winds that would blow then? Yes, I'd give the Devil benefit of law, for my own safety's sake.

Robert Bolt, "A Man For All Seasons," pp. 37–38 (Vintage Books: New York, 1962).

### III

### DIRECTION FOR ENTRY OF JUDGMENTS

In accordance with the foregoing, judgments will be entered as follows:

(1) Finding defendant Rennard C. Davis not guilty of the charges against him in Specifications II and V against said defendant and acquitting said defendant of said charges; and further directing that said defendant be discharged.

(2) Finding defendant Thomas E. Hayden not guilty of the charge against him in Specification III against said defendant and acquitting said defendant of said charge; and further directing that said defendant be discharged.

(3) Finding defendant Leonard I. Weinglass not guilty of the charge against him in Specification III against said defendant and acquitting said defendant of said charge; and further directing that said defendant be discharged.

(4) Finding defendant David T. Dellinger not guilty of the charge against him in Specification III against said defendant and acquitting said defendant of said charge.

(5) Finding defendant Abbott H. Hoffman not guilty of the charges against in Specifications II, IV and V against said defendant and acquitting said defendant of said charges.

(6) Finding defendant Jerry C. Rubin not guilty of the charge against him in Specification IV against said defendant and acquitting said defendant of said charge.

(7) Finding defendant William M. Kunstler not guilty of the charges against him in Specifications I, IV, V and VIII against said defendant and acquitting said defendant of said charges.

(8) Finding defendant Abbott H. Hoffman guilty of the charges against him in Specifications VI and VII against said defendant and convicting said defendant of the crime of contempt of court as charged in said specifications; but directing that no sentence be imposed and that said defendant be discharged.

(9) Finding defendant Jerry C. Rubin guilty of the charges against him in Specifications V and VI against said defendant and convicting said defendant of the crime of contempt of court as charged in said specifications; but directing that no sentence be

imposed and that said defendant be discharged.

(10) Finding defendant David T. Dellinger guilty of the charges against him in Specifications IV, V, VI, VII, VIII, IX and X against said defendant and convicting said defendant of the crime of contempt of court as charged in said specifications; but directing that no sentence be imposed and that said defendant be discharged.

(11) Finding defendant William M. Kunstler guilty of the charges against him in Specifications VI and VII against said defendant and convicting said defendant of the crime of contempt of court as charged in said specifications; but directing that no sentence be imposed and that said defendant be discharged.

It is so ordered.

## APPENDIX

*Revised Contempt Specifications and Relevant Excerpts From the Official Transcript not Included in the Specifications*

### October 30, 1969

### WILLIAM M. KUNSTLER

#### I

On October 30th, as the Court was attempting to maintain order by restraining the defendant Bobby Seale, Mr. Kunstler not only made no attempt to aid the Court in maintaining order, but engaged in the following colloquy as well:

Mr. Kunstler: Your Honor, are we going to stop this medieval torture that is going on in this courtroom? I think this is a disgrace.[1]

Mr. Rubin: This guy is putting his elbow in Bobby's mouth and it wasn't necessary at all.

Mr. Kunstler: This is no longer a court of order, your Honor; this is a medieval torture chamber. It is a disgrace. They are assaulting the other defendants also.[1]

Mr. Rubin: Don't hit me in the balls, motherfucker.[2]

Mr. Seale: This motherfucker is tight and it is stopping my blood.

Mr. Kunstler: Your Honor, this is an unholy disgrace to the law that is going on in this courtroom and I as an American lawyer feel a disgrace.

Mr. Foran: Created by Mr. Kunstler.

Mr. Kunstler: Created by nothing other than what you have done to this man.

Mr. Hoffman: . . . "—being a defendant—" [*sic*, not in Transcript]. You come down here and watch it, Judge.

Mr. Foran: May the record show that the outbursts are the defendant Rubin.

Mr. Seale: You fascist dogs, you rotten, low-life son of a bitch. I am glad I said it about Washington used to have slaves, the first President.

Mr. Dellinger: Somebody protect him [*sic*, Transcript reads, "Somebody go to protect him."].

Mr. Foran: Your Honor, may the record show that it is Mr. Dellinger saying "Someone go to protect him" and the other comment is by Mr. Rubin.

Mr. Rubin: And my statement, too.

The Court: Everything you say will be taken down.

Mr. Kunstler: Your Honor, we would like the names of the marshals. We are going to ask for a judicial investigation of the entire condition [*sic*, incident?] and the entire treatment of Bobby Seale.

The Court: You ask for anything [that] you want. When you begin to keep your word around here that you gave the Court, perhaps things can be done.

---

1. Mr. Kunstler testified that he did not say, "I think this is a disgrace."; "They are assaulting the other defendants also."

2. The testimony is conflicting as to whether Rubin or Seale made this remark.

Mr. Kunstler: If we are going to talk about words, I am prepared to give you back your word about Mr. Ball yesterday and what he said you said to him. We have the transcript now.

The Court: Don't point at me, sir, in that manner.

Mr. Kunstler: If we are going to talk about words, I'd like to exchange some.

The Court: Don't point at me in that manner.

Mr. Kunstler: I just feel utterly ashamed to be an American lawyer at this time.

The Court: You should be ashamed of your conduct in this case, sir.

Mr. Kunstler: What conduct, when a client is treated in this manner.

The Court: We will take a brief recess.

Mr. Kunstler: Can we have somebody with Mr. Seale? We don't trust—
(Tr. 4,815–17).

### RENNARD C. DAVIS

### II

On October 30, when the jury returned to the courtroom, the defendant Davis rose from his seat at the defense table and made the following speech to the jury:

> Ladies and gentlemen of the jury, I am trying to say he was being tortured while you were out of this room by these marshals. They came and tortured [*sic*, Transcript reads, "come and torture"] him while you are out of the room. It is terrible what is happening. It is terrible what is happening. (Tr. 4,845).

### THOMAS E. HAYDEN

### III

On October 30, when the Court was compelled to direct the marshals to restrain Mr. Seale, the following incident occurred:

> Mr. Seale: The Judge is not —he is not trying to give you no fair trial. That's what you are. You are

lying. You know exactly what you are.

Mr. Hayden: Now they are going to beat him, they are going to beat him.

Mr. Hoffman: You may as well kill him if you are going to gag him. It seems that way, doesn't it?

The Court: You are not permitted to address the court, Mr. Hoffman. You have a lawyer.

Mr. Hoffman: This isn't a court. This is a neon oven.

Mr. Foran: That was the defendant Hoffman who spoke.

The Court: Let the record show that the defendant Hoffman spoke.

Mr. Schultz: Prior to that it was Mr. Hayden who was addressing the jury while they were walking out of here.

Mr. Hayden: I was not addressing the jury. I was trying to protect Ms. [*sic*, Mr.] Seale. The man is supposed to be silent when he sees another man's nose being smashed?

Mr. Hoffman: The disruption started when these guys got into overkill. It is the same exact [*sic*, not in Transcript] thing as last year in Chicago, the same exact thing.

The Court: Mr. Hoffman, you are directed to refrain from speaking you are ordered to refrain from speaking. It is clear that [*sic*, not in Transcript] after this morning that I think we cannot go ahead. I would be glad to entertain first suggestions from the government and then from the defense as to whether or not this trial shouldn't be recessed until two o'clock. I am perfectly willing to try to continue and do my best to discharge the obligations of my office.

Mr. Foran: Your Honor, I would like to see if we couldn't continue.

The Court: What do you say?

Mr. Foran: I would like to see if we could continue.

The Court: All right. It will take some time to—then we will take a brief recess.

Mr. Hayden: I thought you were going to ask the defendants.

Mr. Weinglass: Are we part—weren't we being invited to participate in the dialogue between then [*sic*, Transcript reads, "the"]—

Mr. Schultz: It is they who are disrupting this trial and now they want to make the decision as to whether or not we should proceed. It is incredible. It is they who are fostering this and they want to advise the court—

The Court: I have ordered a recess.

Mr. Weinglass: The court invited it.

The Court: Let the record show that. [*sic* "—" appears in Transcript].

Mr. Hayden: Stand up. Stand up. Don't let them have any pretext.

The Court: Let the record show that Mr. Hayden asked [the] people—

Mr. Hayden: I ask the people there to do what they were told and they did it.

The Court: Mr. Hayden, do not try to fill my sentences out for me and you are not permitted to speak except as you may come to be a witness in this case. You are not permitted to speak out loud. You may, of course, consult with your lawyer. (Tr. 4846-49).

### ABBOTT H. HOFFMAN

### II

On October 30, when the Court was compelled to deal appropriately with Mr. Seale, Mr. Hoffman engaged in the following:

Mr. Seale: The Judge is not—he *is* not trying to give you no fair trial. That's what you are. You are lying. You know exactly what you are.

Mr. Hayden: Now they are going to beat him, they are going to beat him.

Mr. Hoffman: You may as well kill him if you are going to gag him. It seems that way, doesn't it?

The Court: You are not permitted to address the Court, Mr. Hoffman. You have a lawyer.

Mr. (*sic.*) Mr. Hoffman: This isn't a court. This is a neon oven.

Mr. Foran: That was the defendant Hoffman who spoke.

The Court: Let the record show that the defendant Hoffman spoke. (Tr. 4,846).

And very shortly thereafter he continued in the following interchange:

[The omitted portion of the transcript reads as follows:

Mr. Schultz: Prior to that it was Mr. Hayden who was addressing the jury while they were walking out of here.] (Tr. 4,846).

Mr. Hayden: I was not addressing the jury. I was trying to protect Mr. Seale. The man is supposed to be silent when he sees another man's nose being smashed?

Mr. Hoffman: The disruption started when these guys got into overkill. It is the same thing as last year in Chicago, the same exact thing.

The Court: Mr. Hoffman, you are directed to refrain from speaking. You are ordered to refrain from speaking. (Tr. 4,847).

After this interchange the Court determined that a recess would be appropriate. When the Court left the bench the defendant Hoffman refused to rise in the customary manner. (Tr. 4,849).[3]

### November 26, 1969

### DAVID T. DELLINGER

### III

On November 26, after the Court had made a ruling refusing to grant a writ

---

3. The government does not assert Hoffman's refusal to rise as a separate contempt.

of habeas corpus ad testificandum, the following colloquy took place:

Mr. Dellinger: Aw Jesus—fascist—

The Court: Who is that man talking, Mr. Marshal?

Mr. Dellinger: That is Mr. David Dellinger and he is saying that that is an arbitrary denial when you say who is key to our defense. We know who is key to our defense and we want to put on our key defense witness.

The Court: Mr. Marshal, ask that man to sit down.

The Marshal: Sit down, Mr. Dellinger.

Mr. Dellinger: I think that is acting like a fascist court like Mr. Seale said when you make decisions of that kind and deprive us of our witnesses. Because he has already been persecuted in one court, now you are persecuting him and us in another court [*sic*, one]. (Tr. 8,078).

## ABBOTT H. HOFFMAN

## IV

On November 26, after the Court made a ruling the following colloquy occurred:

The Court: I decide each motion on its own papers, sir, and I am not aware of any witnesses that the Government has srought (*sic*.) to bring here. I don't know whether—

Mr. Hoffman: We are very confused about this. Is the Government going to present our defense as well as our prosecution?

The Court: Have you gotten that —what is the name of that defendant speaking?

Mr. Hoffman: Just Abbie. I don't have a last name, Judge. I lost it. We can't respect the law when it's tyranny.

The Court: Are you able to hear the defendant Hoffman speaking?

Mr. Hoffman: Abbie.

The Reporter: Yes, sir. (Tr. 8,081).

December 9, 1969

## DAVID T. DELLINGER

## IV

During the testimony of the witness Meyerding, the following occurred:

The Court: I note for the record that certain of the defendants, Dellinger particularly—

Mr. Dellinger: I did not.

The Court: —made noises.

Mr. Dellinger: I beg your pardon, I did not utter a single noise. When I have noises, [*sic*] ["*sic*" does not appear in Transcript] I stand up and say so.

The Court: I heard you, sir.

Mr. Dellinger: I did not sigh; I did not utter a single noise, absolutely not.

The Court: And the man sitting next to you did also.

Mr. Dellinger: You mean to say ["to say" does not appear in Transcript] you are calling me a liar? If so, you are a liar. I did not utter a single noise.

The Court: And make a note of that last statement.

Mr. Dellinger: I have called this a fascist court before and I think he is trying to prove it. It is absolutely irresponsible on your part.

The Court: Make a note of that last statement.

Mr. Dellinger: Absolutely irresponsible.

The Marshal: Sit down, please.

Mr. Dellinger: And dishonest.

The Court: Make a note of that last statement. Miss Reporter, have you all of Mr. Dellinger's comments? Have you? [*sic*, Transcript reads, "Miss Reporter, you have all of Mr. Dellinger's comments, have you?"]

The Reporter: Yes. (Tr. 10,086–87).

December 15, 1969

## DAVID T. DELLINGER

### V

On December 15, when the Court was compelled to request the marshal to remove Mr. Stuart Ball, Jr., the following occurred:

The Court: Mr. Marshal, take Mr. Ball out.

Mr. Dellinger: That is an injustice.

Mr. Kunstler: That is a lawyer who is part of our defense team.

The Court: He is not a lawyer admitted to practice in this court.

Mr. Kunstler: You are removing a lawyer from the defense table.

The Court: No, he is not a lawyer admitted to practice here.

Mr. Kunstler: That doesn't matter, your Honor. He is—

Mr. Dellinger: He wasn't laughing. (Tr. 11,179–80).

A few moments later, the following colloquy occurred:

[The omitted portion of the transcript reads as follows:

Mr. Kunstler: You have given him permission to sit here.

The Court: I withdraw the permission.

Mr. Kunstler: Your Honor, he—

The Court: I won't conduct this trial in a disorderly manner. That will be all.

Mr. Kunstler: Your Honor, this is the second time you have picked the wrong man.

Mr. Dellinger: Your Honor—

Mr. Kunstler: Mr. Davis has admitted he laughed.

The Court: That will be all, sir. Now I am making a ruling.

Mr. Hoffman: I was laughing.

Mr. Kunstler: I know, but you are depriving us of a lawyer at our defense table.

The Court: That is just too bad. You will have to suffer through without him. He is not a lawyer admitted to practice here.

Mr. Kunstler: He is a member of the bar of the District of Columbia. He has been assisting us for three months through this trial.

The Court: Let him go back to the District of Columbia. I will not have him here laughing at me while I am trying to rule—] (Tr. 11,180–81).

Mr. Kunstler: But he didn't laugh, your Honor. If he laughed, that is one thing, perhaps, but two defendants have admitted laughing.

The Court: My eyesight is good and my hearing is good.

Mr. Kunstler: You were wrong about Mr. Dellinger. You thought he made a noise. We have submitted an affidavit as to that.

The Court: I suppose I didn't hear him call me a liar in open court.

Mr. Kunstler: That is a different matter, your Honor.

The Court: Oh—

Mr. Dellinger: I said if you said I was talking that that was a lie, that you were calling me a liar.

The Court: You didn't—you said "You are a liar."

Mr. Kunstler: No. Read the transcript.

Mr. Dellinger: You accused me of being a liar and I said that was a lie.

The Court: Will you sit down?

Mr. Dellinger: And you are very prejudiced and unfair and I state that in open court. It is not a fair trial and you have [*sic*, had] no intention of giving us a fair trial and when I speak throughout the country, I say that you are the assistant prosecutor [*sic*, Assistant Prosecutor] or maybe the chief prosecutor [*sic*, Chief Prosecutor] and it is true and the people of this country will come to learn that about you and about some other judges in this court.

A Spectator: Right on.

[The omitted portion of the transcript reads as follows:

Mr. Dellinger: That's why I called it a fascist court before.

A Spectator: Right on.] (Tr. 11,183).

Mr. Davis: That's why we were laughing.

(There was disorder in the courtroom.) [*sic*, not in Transcript].

A Spectator: Right on, boys [*sic*, does not appear in Transcript].

Mr. Hoffman: You said you were doing it for us.

The Court: Have you got all those remarks, Miss Reporter?

Mr. Dellinger: Now one of our legal staff you have falsely accused and that is why I speak up.

The Court: Now, if you will permit me—

Mr. Kunstler: Your Honor, what is happening? The marshals are taking people out.

A Spectator: Why don't you clear the whole courtroom?

The Court: Will you—

Mr. Dellinger: You see, we are interested in the truth and you are not and the government is not and that is what the conflict is here. (Tr. 11,182–84).

December 30, 1969

DAVID T. DELLINGER

VI

On December 30, during the direct examination of the witness Hoffman, the following occurred:

Mr. Marshal: Mr. Dellinger—

Mr. Dellinger: I am a little upset by the dishonesty of the court's process—yes, my name is David Dellinger.

The Court: That man's name is Dellinger, Miss Reporter.

Mr. Dellinger: They are not interested in the truth. They just want one side of things to go in, even made up things, but they won't allow the real things, the real truth.

The Court: Mr. Dellinger is continuing to speak, Miss Reporter.

Mr. Dellinger: Darned right. I hope the jury understands that, too.

Mr. Schultz: Your Honor, this is a deliberate attempt to make it appear— [*sic*, Transcript reads, "Your Honor, this is a deliberate attempt to try to make it appear—"]

Mr. Dellinger: What do you—

Mr. Schultz: —That because the defendant's [*sic*] don't follow—

The Court: Mr. Schultz—

[The omitted portion of the transcript reads as follows:

Mr. Schultz: This is unfair to the government.

The Court: Mr. Schultz.] (Tr. 12,914).

Mr. Kunstler: Oh, your Honor—unfair to the government.

Mr. Dellinger: The government will go to jail for ten years, I suppose.

Mr. Schultz: Your Honor—

The Court: Just minute, sir. Now, Mr. Schultz, don't underestimate anybody's intelligence. Anyone knows that has been in a courtroom before that a defendant represented by counsel doesn't speak out. [*sic*, Transcript reads, "Anyone knows that has been in a courtroom before that a defendant represented by able counsel doesn't speak out. Mr. Dellinger has spoken out."]

Mr. Dellinger: Even when he's being railroaded he doesn't speak out.

The Court: I hope, Miss Reporter, you get those remarks.

Mr. Kunstler: Your Honor, there comes a time when every human being feels the [*sic*, a] necessity to speak out and Mr. Dellinger—

The Court: I didn't ask you to philosophize.

Mr. Kunstler: I am not philosophizing, I am defending a client.

The Court: There comes a time when courtroom decorum must be observed [*sic*, "sir" omitted].

Mr. Dellinger: Decorum is more important than justice, I suppose.

The Court: I have never sat in a trial over the many years where a defendant has spoken up on his own when—

Mr. Froines: Perhaps you can give him four years like you gave Bobby Seale.

Mr. Dellinger: We just walk politely into jail. (Tr. 12,913–16 [*sic*, 15]).

And very slightly later:

[The omitted portion of the transcript reads as follows:

Mr. Schultz: Mr. Froines is the one who just made that comment about Bobby Seale. I am sure the court saw that, and what's worse is the attorneys sanction it, they encourage it.

Here is Mr. Kunstler standing at the podium encouraging this action, which—

The Court: That's right.

Mr. Schultz: —is grossly improper.

The Court: That's right.

Mr. Kunstler: Your Honor, you are agreeing with the U. S. Attorney. I can see that.

The Court: And I ask you to sit down.

Mr. Kunstler: I am explaining the actions of Mr. Dellinger who is a sensitive human being and who felt impelled to say something.

The Court: I feel his actions require no explanation.

Mr. Kunstler: Yes, they do, Your Honor.] (Tr. 12,915–16).

The Court: And I direct you to sit down or I will have the marshal—

Mr. Kunstler: Mr. Schultz says—

The Court: Please ask his lawyer to sit down.

Mr. Kunstler: I have a right to stand and talk in defense of my [*sic*, a] client.

Mr. Dellinger: That's why we have to speak up, because you won't let our lawyers have a fair chance. (Tr. 12,916).

January 6, 1970

## WILLIAM M. KUNSTLER

## IV

On January 6 the defendants called Mayor Richard J. Daley of Chicago to the stand as their witness. In a colloquy prior to the witness' taking the stand Mr. Kunstler clearly indicated his understanding of the limitations on interrogating one's own witness. Furthermore, the Court ordered that any motions to declare the witness Daley a "hostile witness" be made outside the presence of the jury. Mr. Kunstler directly violated the Court's order by moving to have the witness Daley declared a "hostile witness" in the presence of the jury (Tr. 13,944).

January 12, 1970

## DAVID T. DELLINGER

## VII

On January 12th the court made an evidentiary ruling and the following occurred:

The Court: The objection of the government to Defendants' Exhibit 279 for identification will be sustained.

Mr. Dellinger: Oh, ridiculous.

The Court: Who said "ridiculous"?

Mr. Dellinger: I did. It was ridiculous. I stand on that fact. You don't want us to have a defense.

The Court: I just wanted to know who said that.

Mr. Dellinger: You don't want us to have a defense. You are a hypocrite.

The Court: Did you get all those remarks? [*sic*, Transcript reads, Did you get all of those remarks, Miss Reporter? "]

Mr. Dellinger: I stand by them, too. You earned them. It really brings the whole system of justice under discredit when you act that way. What Mayor Daley and the police did for the electoral process in its present form you are now doing for the judicial process.

The Court: Mr. Marshal—

Mr. Davis: We want a fair trial.

Mr. Dellinger: You don't think it is a fair trial, do you?

Mr. Marshal: Just be quiet, Mr. Dellinger.

Mr. Dellinger: You are being paid by the same company but you ought to be able to think for yourself a little bit.

The Court: Bring in the jury.

Mr. Weinglass: If your Honor please, before the jury comes in, I have a motion to make on behalf of the defendants. Prior to the jury leaving the court and while they were still here in the room and pursuant to my request for a five minute adjournment, your Honor made a statement in open court in the presence of the jury that it was your attitude that this case should be "gotten rid of."

The Court: I didn't say that.

Mr. Dellinger: You did.

A Defendant: You did so.

The Court: I said we shouldn't be wasting time. You got more than a five minute recess. I waited here [Transcript reads, "I waited here—"].

Mr. Dellinger: You said "get rid of the case."

Mr. Weinglass: As far as I'm [*sic*, am] concerned—

The Court: Mr. Marshal, will you tell that man to remain quiet?

The Marshal: Mr. Dellinger—

Mr. Weinglass: I most respectfully dispute the Court's recollection. Your Honor did use the words "get rid of."

The Court: Whether you are respectful or not, the evidence of the respect with which the court is treated has [*sic*, "just" omitted] been demonstrated by one of the defendants.

Mr. Dellinger: I didn't say anything you didn't deserve.

The Court: I will say to you, Mr. Weinglass—

Mr. Dellinger: I only speak [*sic*, spoke] the truth. (Tr. 15,139–41).

January 14, 1970

### DAVID T. DELLINGER

### VIII

On January 14th the following occurred:

The Court: Mr. Marshal, I am not here to be laughed at by these defendants, particularly Mr. Rubin.

Mr. Marshal: Mr. Dellinger, also, will you refrain from laughing?

Mr. Dellinger: That is a lie. And it wasn't Mr. Rubin. We laugh enough and you can catch us when we do but you just happened to get the wrong one. [*sic*, Transcript reads, "We laugh enough and you can catch us when we do but you just happened to get that one wrong."]

Mr. Kunstler: Your Honor, I don't think the record should constantly have these references to chuckles.

The Court: I think the record should show that and I see that the record does. I don't share your view.

Mr. Kunstler: The Court has made a sally before and the room laughed and you didn't put that on [*sic*, in] the record.

The Court: I will not sit here—and you must know it by now, certainly—and have defendants laugh at my rulings [*sic*, ruling], sir. And I will not hear you on that.

Mr. Kunstler: You don't mind if they laugh at me or if they laugh at someone else.

The Court: I will ask you to sit down.

\* \* \* \* \* \*

[The omitted portion of the transcript reads as follows:

Mr. Kunstler: I don't think your Honor's ultra-sensitivity should make a difference in rulings in this court.

The Court: It isn't ultra-sensitivity. It is a proper understanding of the conduct of a trial in the federal district court.

Mr. Kunstler: When you interpret it as a laugh at you—

The Court: Some people here don't seem to know about it.

Mr. Kunstler: No, but, your Honor, when you try to interpret a laugh as meaning you are the butt of a joke, then you react—

The Court: I will ask you to sit down. Did you hear me?

Mr. Kunstler: I just don't want to get thrown in my chair by the Marshal so I will have to sit down, but I just don't think it is fair to do that.

Mr. Hoffman: I laughed anyway.

The Court: Will you be quiet, Mr.—

Mr. Hoffman: I laughed. It wasn't Jerry. It was me.

The Court: Did you get that, Miss Reporter?

Mr. Hoffman: —at that ruling. I laughed. He didn't.

The Court: That was Mr. Dellinger.

Mr. Kunstler: That was not Mr. Dellinger.

Mr. Schultz: Your Honor, that was Mr. Hoffman.

Mr. Kunstler: Your Honor—

Mr. Schultz: That was the defendant Hoffman speaking.

Mr. Hoffman: I swas [sic] him.]

(Tr. 15,586–87).

The Court: Will you sit down? I saw Mr. Dellinger talking. If anybody else did—

Mr. Dellinger: You did not see me talking. My lips were not moving. That is not the first time you have lied in this courtroom. My lips were not moving.

The Court: Did you get those last remarks?

Mr. Schultz: It was the defendant Hoffman.

Mr. Dellinger: If you can make an honest mistake, that's all right, but to lie about it afterwards and say you saw me talking when you didn't, that is different.

The Court: Will you ask that man to sit down.

Mr. Dellinger: You will go down in infamy in history for your obvious lies in this courtroom, of which that is only the most recent one.

Mr. Marshal: Sit down, sir.

Mr. Dellinger: It is absolutely true what I am saying.

Mr. Marshal: Will you—

Mr. Dellinger: Absolutely true.

The Court: Mr. Marshal, will you ask that man to be quiet? [sic, Transcript reads, "Mr. Marshal, will you ask him to be quiet."]

Mr. Dellinger: You will be ashamed of that for the rest of your life, if anything can shame you.

Mr. Schultz: Your Honor, it was the defendant Hoffman sitting immediately behind Dellinger who made those remarks.

The Court: Let the record show—

Mr. Dellinger: Thanks for telling the truth, Mr. Schultz.

Mr. Kunstler: Mr. Hoffman attempted to clarify the record. He was the one responsible. He took the blame for it. It was not Mr. Dellinger or anyone else, or Mr. Rubin.

The Court: Oh, I heard Mr. Rubin and saw him.

Mr. Kunstler: Your Honor—

The Court: Will you please sit down? I will make the rulings here. The record will be what it is.

Mr. Kunstler: I want the record [sic, "to" omitted]—

The Court: It can't be any more clear.

Mr. Dellinger: I want to make the record clear. Mr. Rubin did not laugh. You [sic, Transcript reads, "and you"] are standing there saying you heard it. That is why I called you a liar. He did not laugh. I was sitting next to him.

The Court: Mr. Marshal—

Mr. Dellinger: And you made it up. It is about time this got out into the open so everyone [sic, everybody] could

know what you are doing here. It is one thing to be prejudiced, it is another thing to be a liar.

The Court: Mr. Marshal, I ask you to restrain that man.

The Marshal: Be quiet.

Mr. Kunstler: He is trying to clarify the record.

The Court: He has got a lawyer.

Mr. Kunstler: I am his lawyer and I represent—

The Court: That is right, and we have had enough of this [sic, it].

Mr. Kunstler: But the record must be crystal clear that it was not Mr. Dellinger, it was not Mr. Rubin. Mr. Hoffman—

The Court: Mr. Dellinger said enough.

Mr. Kunstler: Mr. Hoffman has taken the blame.

The Court: I have never sat in fifty years through a trial where a party to a law suit called the judge a liar.

Mr. Dellinger: Maybe they were afraid to go to jail rather than tell the truth, but I would rather go to jail for however long you send me than to let you get away with that kind of thing and people not realize what you are doing.

The Court: Mr. Marshal, do I have to tell you again sir. (Tr. 15,185–91).

### January 23, 1970

### DAVID T. DELLINGER

### IX

On January 23, during the—direct examination of the witness Davis, the court indicated that argument on a mistrial motion had been completed, and ordered Mr. Kunstler to sit down. After Mr. Kunstler flaunted the court's orders and continued to argue, the defendant Dellinger rose from his place at the defense table, and the following incident ensued:

Mr. Kunstler: You haven't even heard the motion.

Mr. Rubin: You haven't heard it yet.

The Court: For a mistrial.

Mr. Kunstler: Yes, but I would like to argue it.

The Court: Oh, there is no ground for a mistrial.

Mr. Kunstler: Your Honor knows you have referred to the question of defendants taking the stand. You have committed the cardinal error of a court with reference—

[The omitted portion of the transcript reads as follows:

The Court: I ask you to sit down, sir.

Mr. Kunstler: But, your Honor—] (Tr. 17,371).

The Court: I direct the marshal to have this man sit down.

Mr. Kunstler: Every time I make a motion am I going to be thrown in my seat when I argue it?

The Court: You may sit down.

Mr. Dellinger: Force and violence.

Mr. Kunstler: If that is the ruling of the court, that we cannot argue without being thrown in our seats—

Mr. Dellinger: The judge is inciting a riot by asking the marshal to have him sit down.

The Court: That man's name is Dellinger.

Marshal Joneson: Will you be quiet, Mr. Dellinger.

Mr. Dellinger: After such hypocrisy I don't particularly feel like being quiet. I said before the judge was the chief prosecutor, and he's proved the point.

The Court: Will you remain quiet. Will you remain quiet, sir.

Mr. Dellinger: You let Foran give a foreign policy speech, but when he tries to answer it, you interrupt him and won't let him speak.

There's no pretense of fairness in this court.

The Court: Mr. Marshal, will you go to that man and ask him to remain quiet.

Mr. Dellinger: No pretense of fairness. All you're doing is employing a

riot—employing force and violence to try to keep me quiet—

Marshal Joneson: Be quiet, sir.

Mr. Dellinger: —just like you gagged Bobby Seale because you couldn't afford to listen to the truth that he was saying to you. You're accusing me. I'm a pacifist.

Marshal Joneson: Sit down, please, and be quiet.

Mr. Dellinger: I [sic, "am" omitted] employ nonviolence, and you're accusing me of violence, and you have a man right here, backed up by guns, jails, and force and violence. That is the difference between us.

Marshal Joneson: Will you sit down.

(Applause.)

The Court: Will you continue, please, with the direct examination of this witness.

Mr. Dellinger: There goes the violence right there.

Mr. Kunstler: That's the government in operation, your Honor, as it has been throughout this trial.

The Witness: Your Honor, that's my sister they are taking out of the courtroom.

The Court: Even your sister—

Mr. Kunstler: Nobody but the government has employed violence in this courtroom—with Bobby Seale, with spectators. (Tr. 17,371–73).

At this point, the marshals found it necessary to remove several of the spectators from the courtroom for disorderly conduct. Mr. Kunstler made some remarks about the removal of the spectators, and Mr. Foran rose to defend the way the trial was being conducted. This precipitated the following outburst from Mr. Dellinger:

[The omitted portion of the transcript reads as follows:

The Court: Since you refer to Bobby Seale, your client, I recall—

Mr. Kunstler: Not my client, your Honor.

The Court: —I recall being called various kinds of pigs by that man.

Mr. Rubin: Bill, they are taking out my wife.

Mr. Kunstler: Well, your Honor would not let him defense [sic] himself. Everyone knows that now.

(Cries of "Hey, stop it.")

Mr. Kunstler: Your Honor, must we always have this, the force and power of the Government?

Mr. Foran: Your Honor—

Mr. Rubin: They are dragging out my wife—will you please—

The Court: We must have order in the courtroom.

Mr. Kunstler: They like to strike women, your Honor, we have seen that constantly here.] (Tr. 17,374).

Mr. Foran: Your Honor, traditionally in American law, cases are tried in a courtroom by the participants in the trial, not the audience, not spectators, not relatives of the defendants, but by witnesses and by the court and by the jury, not by shouting and screaming and voluntary statements from counsel, or from the defendants shouting out in courtrooms, because that is the American judicial system, and it's worked very well for two hundred years, and it's not going to change now for these people.

Mr. Dellinger: Yes, kept the black people in slavery for two hundred years and wiped out the Indians and kept the poor people in problems and started the war in Viet Nam which is killing off at least a hundred Americans and a thousand Vietnamese every week, and we are trying to stop it.

Marshal Joneson: Sit down.

Mr. Dellinger: And you call that ranting and raving and screaming because we speak the truth.

Marshal Joneson: Mr. Dellinger, sit down, please.

Mr. Foran: Your Honor, in the American—

Mr. Dellinger: And that judge [sic, Judge] won't let that issue come into the trial, that's why we are here.

Mr. Foran: Your Honor, in the American system there is a proper way to raise such issues and to correct them.

Mr. Dellinger: That was the proper way with Fred Hampton, wasn't it?

Mr. Kunstler made several more remarks, and Mr. Schultz rose to answer him, and Mr. Dellinger interjected a comment again:

[The omitted portion of the transcript reads as follows:

Mr. Foran: And to correct them, your Honor, by the proper governmental system, and there is a proper way to do that.

Mr. Hoffman: Correction the way you handled the war in Vietnam, the same proper—

Mr. Kunstler: Your Honor, I call your attention to the fact that the Government, before the case ever came here, gave a tremendous press conference announcing this case to the newspapers, tried this thing in the newspapers before you ever saw it in the courtroom. I read the Attorney General's press conference, and I know what he said—

Mr. Schultz: Mr. Kunstler is the last person who should talk about press conferences since he has been in constant violation of the rules prohibiting such while the Government has complied with it one hundred per cent.

Mr. Kunstler: By Attorney General Mitchell's press conference—] (Tr. 17,376–77).

Mr. Schultz: We complied with the rules of this court. We have made no statements to the [*sic*, this] press, to any press, since this case was indicted. Mr. Kunstler, on a regular basis, has been falsifying, falsifying, to the press, violating the rules of the court prohibiting every attorney in this case from making press conferences, and he has been doing it and he stands before this court and says the Government has.

Mr. Dellinger: And they have [*sic*, had] rules like that in Nazi Germany. (Tr. 17,374–77).

V

[T]here was a loud burst of applause from the spectators' galleries and the marshal determined that several spectators would have to be removed. During the removal and disorder, instead of helping the Court to maintain order in the courtroom, Mr. Kunstler issued the following running commentary from the lectern, which had the effect of encouraging disorder among the spectators.

Marshal Johnson [*sic*, Joneson]: Will you sit down.

(Applause).

The Court: Will you continue, please, with the direct examination of this witness.

Mr. Dellinger: There goes the violence right there.

Mr. Kunstler: That's the Government in operation, your Honor, as it has been throughout this trial.

The Witness: Your Honor, that's my sister they're taking out of the courtroom.

The Court: Even your sister—

Mr. Kunstler: Nobody but the Government has employed violence in this courtroom—with Bobby Seale, with spectators.

The Court: Since you refer to Bobby Seale, your client, I recall—

Mr. Kunstler: Not my client, your Honor.

The Court: —I recall being called various kinds of pigs by that man.

Mr. Rubin: Bill, they are taking out my wife.

Mr. Kunstler: Well, your Honor would not let him defend himself, everybody knows that now.

(Cries of "Hey, stop it.")

Mr. Kunstler: Your Honor, must we always have this, the force and power of the Government?

Mr. Foran: Your Honor—

Mr. Rubin: They are dragging out my wife— will you please—

The Court: We must have order in the courtroom.

Mr. Kunstler: They like to strike women, your Honor, we've seen that constantly here. [*sic*, Transcript reads, "we have seen that constantly here."] (Tr. 17,373–74).

### January 24, 1970

### LEONARD I. WEINGLASS

### III

On January 24, during the direct examination of the witness Davis, Mr. Weinglass continued to argue after a ruling had been made and he had been directed to complete his argument. He openly defied the order of the court and refused to continue with the examination when told to do so. The incident is set forth in the transcript as follows:

The Court: I will let my ruling stand.

Mr. Weinglass: Your Honor—

The Court: I said I'd let my ruling stand, sir.

Mr. Weinglass: Your Honor must permit us the opportunity of responding to that.

The Court: I have permitted you. I have permitted Mr. Kunstler to speak, and now you [*sic*, "may" omitted] ask another question of this witness.

Mr. Weinglass: Reverend Abernathy was mentioned as an officer of the National Mobilization.

The Court: Mr. Weinglass—

Mr. Dellinger: He was co-chairman.

The Court: I direct you not to—

Mr. Weinglass: He was national co-chairman.

Mr. Foran: Your Honor, there were seven individuals who are still in this case as part of this indictment. There is no national—

The Court: Will you continue with the examination—

Mr. Weinglass: Your Honor, I would like to ask Mr. Foran what relationship the unidentified speaker had with the National Mobilization. His speech was—

The Court: I order you to continue with his examination, sir.

Mr. Weinglass: I understand your Honor's sensitivity to what Reverend Abernathy said at that particular time.

The Court: And I direct that that remark go out.

Mr. Weinglass: And Senator McCarthy also spoke.

The Court: And I direct the jury to disregard it.

Mr. Weinglass: Two witnesses referred to what Senator McCarthy had to say, and he is not a defendant here.

Mr. Foran: On cross examination, your Honor. On cross examination by these men, not on direct examination by the government.

Mr. Weinglass: On direct examination—

The Court: Will you comply with my order?

Mr. Kunstler: Your Honor, I am going to answer the second part of the argument.

Mr. Weinglass: Richard Goodwin, when he was called as a witness by us, referred to the exact words by Senator McCarthy.

The Court: Will you comply with my order?

Mr. Kunstler: What about the second part of the argument that the mule train was mentioned on direct?

The Court: I will ask you to sit down.

Mr. Kunstler: Your Honor, but that is not—your Honor ruled that was irrelevant.

The Court: I cannot let two lawyers conduct an examination and handle the objections.

Mr. Kunstler: I am not conducting the examination. I raised the second argument and that was not answered, that the SCLC Mule Train, if the mule train was afraid of the demonstrators, why did Ralph Abernathy speak to them the next day?

The Court: Will you comply with my order?

Mr. Weinglass: If your Honor will not permit the jury to hear what Reverend Abernathy said—

Mr. Foran: Listen to that, your Honor. Just listen to that. Isn't that classical?

The Court: I will strike that last remark, and don't make it again. I direct the jury to disregard it.

Mr. Marshal, anyone who laughs aloud at the rulings of the court will please—other than the defendants—be asked to leave the court room.

Mr. Kunstler: Your Honor, I am entitled to an answer to my objection?

The Court: I have heard you.

Mr. Kunstler: Well, the prosecutor has not responded. He has ignored it.

The Court: I have heard you.

Mr. Weinglass: I just want the record to show that Reverend Abernathy was an officer of the National Mobilization.

The Court: Oh, Mr. Weinglass. Mr. Weinglass. I am sorry— (Tr. 17,805–809).

February 2, 1970

WILLIAM M. KUNSTLER

VI

On February 2, after the Court ruled that Mr. Kunstler would have to abide by his representation the previous Friday, and therefore would not be able to call the Reverend Ralph Abernathy to the stand, Mr. Kunstler made the following speech at the conclusion of his argument:

. . . There have been several witnesses called here during this trial—I need not mention their names—whose testimony the Court ruled could not even be presented to the jury: [sic,—] singers, performers, and former office holders. I think in the light of the representations made by you unequivocally, sir, with no reference to Dr. Abernathy, I will deny your motion that we hold—

Mr. Kunstler: I want to comment on this, your Honor, because I think what you have just said is about the most outrageous statement I have ever heard from a bench, and I am going to say my piece right now, and you can hold me in contempt right now if you wish to.

You have violated every principle of fair play when you excluded Ramsey Clark from the [sic, that] witness stand. The New York Times, among others, has called it the ultimate outrage in American justice.

Voices: Right on.

Mr. Kunstler: I am outraged to be in this court before you. Now because I made a statement on Friday that I had only a cameraman, and I discovered on Saturday that Ralph Abernathy, who is the chairman of the Mobilization, is in town, and can be here, and because you took a whole day from us on Thursday by listening to this ridiculous argument about whether Ramsey Clark could take that stand in front of the jury, I am trembling because I am so outraged. I haven't been able to get this out before, and I am saying it now, and then I want you to put me in jail if you want to. You can do anything you want with me, if you want to; because I feel disgraced to be here, to say to us on the technicality of my representation that we can't put Ralph Abernathy on the stand. He is the co-chairman of the MOBE. He has relevant testimony. I know that doesn't mean much in this Court when the Attorney General of the United States walked out of here with his lips so tight he could hardly breathe, and if you could see the expression on his face, you would know, and his wife informed me he never felt such anger at the United States Government as at not being able to testify on that stand.

Voices: Right on.

Mr. Kunstler: You can't tell me that Ralph Abernathy cannot take the stand today because of the technicality of whether I made a representation. That representation was made in perfect good faith with your Honor. I did not know

that Reverend Abernathy was back in the country. We have been trying to get him for a week and a half to be the last witness for the defense in this case. And now to tell me that we are going ahead, the Government is ready, after you took Thursday from us to have this argument over whether a man could be presented to a jury, I told your Honor then, and I am telling you now, no American court has ever done what your Honor did—

Voices: Right on.

Mr. Kunstler: —based it on a case which was inapplicable to the situation. That was done for one purpose only, and the New York Times said it more beautifully than I could say it, and they said, "It was done to make inadmissible anything that would 'interfere' with the Justice Department's intent to prove a conspiracy to incite a riot during the Democratic National Convention."

Voices: Right on.

Mr. Kunstler: That was the reason behind your Honor's ruling, nothing short of that.

I have sat here for four and a half months and watched the objections denied and sustained by your Honor, and I know that that is not a fair trial.

I know it in my heart. If I have to lose my license to practice law and if I have to go to jail, I can't think of a better cause to go to jail for and to lose my license for—

A Voice: Right on.

Mr. Kunstler: —than to tell your Honor that you are doing a disservice to the law in saying that we can't have Ralph Abernathy on the stand. You are saying truth will not out because of the technicality of a lawyer's representation. If that is what their liberty depends upon, your Honor saying I represented to you that I had a cameraman, and that was our only witness, a cameraman, whom we can't get, incidentally, then I think there is nothing really more for me to say.

The Court: There is not much more you could say, Mr. Kunstler.

Mr. Kunstler: I am going to turn back to my seat with the realization that everything I have learned throughout my life has come to naught, that there is no meaning in this court, and there is no law in this court—

Voices: Right on.

Mr. Kunstler: —and these men are going to jail by virtue of a legal lynching—

Voices: Right on.

Mr. Kunstler: —and that your Honor is wholly responsible for that, and if this is what your career is going to end on, if this is what your pride is going to be built on, I can only say to your Honor, "Good luck to you."

(There were shouts of "Right On," and there was applause in the courtroom.) (Tr. 19,108–112).

## WILLIAM M. KUNSTLER

### VII

After the Court ruled, on February 2, that the Reverend Abernathy would not be permitted to take the stand, the Court ordered that Mr. Kunstler and the other attorneys and defendants not mention the name of the Reverend Abernathy in front of the jury. Mr. Kunstler not only defiantly indicated that he fully intended to violate that order, but in the middle of the direct testimony of the witness Lynskey, Mr. Kunstler actually brought the Reverend Abernathy into the courtroom and made a statement to the jury and physically embraced the Reverend Abernathy in front of the jury. This flagrant violation of the Court's order is reported as follows:

### PART I

Mr. Schultz: Your Honor, may the defendants and their counsel then not make any reference in front of the [*sic*, this] jury that they wanted Doctor [*sic*, Dr.] Abernathy to testify?

Mr. Kunstler: No, no.

The Court: I order you not to make such a statement.

Mr. Kunstler: We are not going to abide by any such comment as that.

Doctor Ralph Abernathy is going to come into this courtroom, and I am going to repeat my motion before that jury.

The Court: I order you not to.

Mr. Kunstler: Then you have to send me to jail, I am sorry.

Mr. Schultz: Your Honor, it is our position we are ready to go ahead now. If Doctor Abernathy were here, if he were here, it would be our position that they could put him on, but he is not here. We are ready to go ahead. We would like to proceed with the case.

The Court: Bring in the jury, Mr. Marshal.

Mr. Kunstler: We have a right to state our objection to resting before the jury.

The Court: Don't do it.

Mr. Kunstler: I am going to have to put my liberty in your hands on that score.

Mr. Schultz: Mr. Kunstler is simply inviting it.

Mr. Kunstler: Oh, of course, I am inviting it because what your Honor is doing is a disgrace in this court.

The Court: He did more than invite.

Mr. Kunstler: He will be here in five minutes. Your Honor, what is an honest man to do when your Honor has done what he has done? What am I to do? Am I to stand here and say, "Yes, yes, yes"?

The Court: I will ask you to sit down. I have heard enough from you along this [*sic*, that] line this morning, sir. I have never as a lawyer or a judge heard such remarks in a courtroom made by a lawyer.

Mr. Kunstler: Your Honor, no one has heard of such conduct as is going on in this courtroom from the bench. The New York Times is not alone in that respect, and this is the ultimate outrage—and I didn't say [*sic*, "that" omitted]—the editorial writers of the New York Times said that.

Mr. Schultz: May we proceed, your Honor?

The Court: Yes. I have ordered the jury brought in. (Tr. 19,140–42).

PART II

Mr. Kunstler: Your Honor, if I can interrupt, Doctor Ralph Abernathy has just arrived.

The Court: Let him sit down.

Mr. Kunstler: I would like to put him on the stand for the defense.

The Court: Let him sit down.

Mr. Kunstler: I would like to move to reconsider to put him on the stand as a witness for the defense. It is now just 11:37.

The Court: Let him sit down, please. You may continue with your examination, Mr. Foran.

Mr. Kunstler: Does your Honor deny my motion?

The Court: I do, sir.

You may continue with your examination.

Mr. Kunstler: Your Honor, it is only 16 minutes after the Government said they would have no objection to having [*sic*, have] Doctor Abernathy testify. He was flown here from Atlanta to be a witness for the defense.

The Court: I do not interpret what the Government says to mean that, and the Government is not running this courtroom.

Mr. Kunstler: Your Honor—

The Court: Will you continue?

Mr. Kunstler: Is the truth to be deprived from this jury because of 16 minutes?

Mr. Foran: Your Honor, the Government is in the middle of the examination of a witness.

Mr. Kunstler: We have tried to get the few minutes delay so we could bring [*sic*, being] Doctor Abernathy here.

The Court: I ask you to sit down, sir.

By Mr. Foran:

Q. What was the noise level at that [*sic*, this] time?

Mr. Kunstler: Your Honor, before this goes on, would your Honor permit an application for Doctor Abernathy to testify after this witness has testified?

The Court: I ask you to sit down.

Mr. Kunstler: Otherwise we are going to excuse him.

The Court: Mr. Marshall, have that lawyer sit down.

Mr. Kunstler: Can you give me an answer to my question? We want to excuse Doctor Abernathy.

The Court: If you will please sit down—

Mr. Kunstler: I am going to be forced in a minute so I have no alternative.

The Court: Yes.

Mr. Kunstler: Can I get an answer sitting down to my question?

Mr. Foran: Your Honor, the interruption in the midst of the questioning of a witness in the presence of the jury is unheard of, your Honor. I wish he would—

Mr. Froines: So is not putting on a witness.

A Voice: —Going to walk out of the courtroom because we can't put a man on the stand—

A Voice: Can't put on our witness—

The Court: Did you hear what I asked you to do, sir?

Mr. Kunstler: I am down.

The Court: Please continue with your examination.

Mr. Kunstler: I am going to ask Doctor Abernathy to leave, your Honor. It is obvious he is not going to testify.

Mr. Foran: Your Honor, the proper procedure is to discuss such matters outside [*sic*, "of" omitted] the presence of the jury, not in the midst of the questioning of the witness.

The Court: I ordered him not to discuss that witness in the presence of the jury before the jury came in. He violated my order.

Mr. Foran: Your Honor, may I wait? May I await Mr. Kunstler returning to counsel table?

Mr. Kunstler: I will be back, your Honor.

The Court: Yes. You may wait.

Let the record show the hug of counsel for the witness [*sic*, defendant].

Mr. Foran: Your Honor, the discussion of whether or not the witness should be called as a witness would [*sic*, should] properly await the finishing of the examination of this witness and the demonstration—

The Court: Go ahead.

Mr. Kunstler: Then I told him to leave, your Honor. He—

The Court: All right. You have told him to leave.

Mr. Kunstler: I can hold him if there is nothing—we want him to testify.

The Court: You told him to leave and I again direct you to sit down. We have had enough this morning.

Mr. Kunstler: May I send one of the defendants out just to ask him to stay, so perhaps—

The Court: No, you may not send one of the defendants out. You may not send—

Mr. Kunstler: May I go and tell him?

The Court: I ask you to sit down.

Mr. Kunstler: Your Honor, just to tell him so that, if the Government is going to permit him to testify—

The Court: I have had enough of your insults this morning.

Mr. Kunstler: Your Honor, this—I am not being insulting.

The Court: You were this morning.

Mr. Kunstler: I was not insulting. I told you the truth this morning. I told you what the New York Times said—

The Court: All right.

Mr. Kunstler: —about the refusal to put a witness on the stand.

The Court: [*sic,* "You" omitted] Sit [*sic,* sit] down, sir, or we will arrange to have you put down. (Tr. 19,154–59).

February 4, 1970

DAVID T. DELLINGER

X

On February 4, the incident occurred which finally led the court to revoke Mr. Dellinger's bail. During the testimony of the witness Riordan, Mr. Dellinger rose from his place at the defense table and interjected the following remark:

Mr. Dellinger: Oh, bull shit.

The Court: Did you get that, Miss Reporter?

Mr. Dellinger: That is an absolute lie.

The Court: Did you get that, Miss Reporter?

Mr. Dellinger: Let's argue about what I stand for and what you stand for, but let's not make up things like that.

The Court: All those remarks were made in the presence of the court and jury by Mr. Dellinger.

After a brief argument about the propriety of the remarks, the court determined to excuse the jury momentarily, and the following incident occurred:

The Court: I will have to excuse you, ladies and gentlemen of the jury, with my usual orders.

Mr. Dellinger: You're a snake. We have to try to put you in jail for ten years for telling lies about us, Dick Schultz.[4]

Marshal Joneson: Be quiet, Mr. Dellinger.

Mr. Dellinger: When it's all over, the judge will go to Florida, but if he has his way, we'll go to jail. That is what we're fighting for, not just for us, but for all the rest of the people in the country who are being oppressed.

A Spectator: Damn right. Assert ourselves.

Voices: Right on.

The Court: Take that man into custody. Mr. Marshal, take that man into custody.

Voices: Right on, right on.

Mr. Schultz: Into custody.

The Court: Into custody.

Voices: Right on.

Mr. Davis: Go ahead, Dick Schultz, put everybody in jail.

Mr. Dellinger: Dick Schultz is a Nazi if I ever knew one.[5]

(Transcript indicates jury had left the courtroom.) (Tr.19,671–72).

Mr. Schultz: Your Honor, will you please tell Mr. Davis to walk away from me?

Mr. Dellinger: Put everybody in jail.

[The omitted portion of the transcript reads as follows:

The Court: Mr. Davis, will you take your chair.

Mr. Hoffman: Nazi jailer.

Mr. Schultz: The defendants have a lot to say, but not on the stand since they won't subject their statements to cross examination, your Honor.

The Court: What did you want to say to me out of the presence of the jury? The jury is gone now.

Mr. Schultz: I would just like to have the record note, of course, that my last statements were made out of the presence of the jury.

The Court: Yes, I do let the record show that.] (Tr. 19,672).

---

4. See following footnote.

5. Dellinger testified that he did not make the remark attributed to him in which he called the prosecutor a snake and accused the prosecutor of lying. He also denied that he made the subsequent comment calling the prosecutor "a Nazi." While it is not certain that Dellinger made the latter comment, the official transcript correctly attributes to Dellinger the former comment. The accuracy of the transcript is supported by Marshal Joneson's order, "Be quiet, Mr. Dellinger."

Mr. Schultz: Your Honor, we have 3500 material. We have 3500 252–A–1 and 252–A–2.

The Court: I would like to make a note of those if you will go slowly, please.

Mr. Schultz: 3500 252–A–1 and 252–A–2. –A–1, your Honor, is the complete document.

Mr. Dellinger: It is completely false [*sic*, fabricated]. (Tr. 19,669–73).

## WILLIAM M. KUNSTLER

### VIII

On February 4, when the Court determined that the time had come to revoke the bail of the defendant Dellinger, there was a loud outburst in the courtroom. It was essential that marshals forcibly clear people from the courtroom in order to maintain order. When disorder broke out in the spectator benches, Mr. Kunstler blamed the disorder on the Court, *fanning the flames of the disorder with these inciting comments:*

Mr. Kunstler: You brought this on, your Honor. This is your fault. This is what happened in Chicago. You made the power move. You exerted the power, and I would like to argue the point.

The Court: You won't argue the [*sic*, that] point.

Mr. Kunstler: I will argue, your Honor, that your Honor's action is completely and utterly vindictive, and there is no authority that says because a defendant blurts out a word in court—

The Court: This isn't the first word, and I won't argue this. (Tr. 19,777–78).

[The omitted portion of the transcript reads as follows:

Mr. Davis: This Court is bullshit.

The Court: There he is saying the same words again.

Mr. Davis: No, I say it.

Mr. Kunstler: The Carbo case does not stand for what your Honor said. Being in custody does not prevent him from saying the same thing.

The Court: Mr. United States Attorney, will you please prepare an order in keeping with my order here today reciting the reasons for my decision.

Mr. Kunstler: And that was not even David Dellinger who made the last remark.

Mr. Schultz: It was Davis, the defendant Davis who just uttered the last—

Mr. Rubin: Everything in this court is bullshit.

Mr. Davis: I associate myself with Dave Dellinger completely 100 percent. This is the most obscene court I have ever seen.

Mr. Rubin: You are not going to separate us. Take us, too.

Take us all. Show us what a big man you are. Take us all.

Mr. Schultz: Your Honor, I ask that you not do them the favor they ask.

Mr. Kunstler: No, your Honor—

Mr. Schultz: Not do them the favor.

The Court: You didn't think I would?] (Tr. 19,778–79).

Mr. Kunstler: No, you know that if you did that, you would add to reversible error in this case. Why not take them all?

[The omitted portion of the transcript reads as follows:

Mr. Davis: Mr. Rubin's wife they are now taking—

Mr. Rubin: Keep your hands off her. You see them taking away my wife?

Mr. Davis: Why don't you gag the press, too, and the attorneys, gag them?] (Tr. 19,779).

Mr. Kunstler: Your Honor, there is [*sic*, was] no need for your action. (Tr. 19,779).

[The omitted portion of the transcript reads as follows:

The Court will be in recess. Mr. Marshal—

The Marshal: Sit down, Mr.—] (Tr. 19,780).

Mr. Kunstler: Your Honor, is there no decency left here? Can't we just argue the point? (Tr. 19,780.)

## RENNARD C. DAVIS

### V

On February 4, when the Court announced that it had determined to revoke the defendant Dellinger's bail, there was an outburst in the courtroom. Mr. Davis inserted the following remark:

The Court: This isn't the first word, and I won't argue this.

Mr. Davis: This Court is bull shit.

The Court: There he is saying the same words again.

Mr. Davis: No, I say it.

[The omitted portion of the transcript reads as follows:

Mr. Kunstler: The Carbo case does not stand for what your Honor said. Being in custody does not prevent him from saying the same thing.

The Court: Mr. United States Attorney, will you please prepare an order in keeping with my order here to-day reciting the reasons for my decision.

Mr. Kunstler: And that was not even David Dellinger who made the last remark.

Mr. Schultz: It was Davis, the defendant Davis who just uttered the last—] (Tr. 19,778).

Mr. Rubin: Everything in this court is bull shit.

Mr. Davis: I associate myself with Dave Dellinger completely 100 per cent. This is the most obscene court I have ever seen.

[The omitted portion of the transcript reads as follows:

Mr. Rubin: You are not going to separate us. Take us, too.

Take us all. Show us what a big man you are. Take us all.

Mr. Schultz: Your Honor, I ask that you not do them the favor they ask.

Mr. Kunstler: No, your Honor—

Mr. Schultz: Not do them the favor.

The Court: You didn't think I would?

Mr. Kunstler: No, you know that if you did that, you would add to reversible error in this case. Why not take them all?] (Tr. 19,778–79).

Mr. Davis: Mr. Rubin's wife they are now taking—

Mr. Rubin: Keep your hands off her. You see them taking away my wife?

Mr. Davis: Why don't you gag the press, too, and the attorneys, gag them. (Tr. 19,778–79).

## JERRY C. RUBIN

### IV

On February 4, after the Court had determined that it must terminate the bail of the defendant Dellinger, Mr. Rubin made the following comments:

Mr. Rubin: Everything in this court is—[sic, "—" does not appear in transcript] bullshit.

[The omitted portion of the transcript reads as follows:

Mr. Davis: I associate myself with Dave Dellinger completely 100 percent. This is the most obscene court I have ever seen.] (Tr. 19,778).

[Mr. Rubin:] You are not going to separate us. [sic, "Take us, too." omitted]. Take us all. Show us what a big man you are. Take us all.

[The omitted portion of the transcript reads as follows:

Mr. Schultz: Your Honor, I ask that you not do them the favor they ask.

Mr. Kunstler: No, your Honor—

Mr. Schultz: Not do them the favor.

The Court: You didn't think I would?

Mr. Kunstler: No, you know that if you did that, you would add to reversible error in this case. Why not take them all?

Mr. Davis: Mr. Rubin's wife they are now taking—] (Tr. 19,779).

[Mr. Rubin:] Keep your hands off her. You see them taking away my wife? (Tr. 19,778–79).

After the Court had recessed that case and ordered the courtroom cleared, Mr. Rubin approached the lectern, pointed his finger directly at the Court [6] and said, "You are a fascist, Hoffman—" [sic, "Hoffman" does not appear in transcript]. (Tr. 19,781).

## ABBOTT H. HOFFMAN

### V

On February 4, at the end of the session, the Court indicated that it had determined to revoke the bill [sic, bail] of the defendant Dellinger. In the uproar which followed this decision Mr. Hoffman made the following remarks:

Mr. Hoffman: You are a disgrace to the Jews. You would have served Hitler better. Dig it.

[The omitted portion of the transcript reads as follows:

Mr. Rubin: You are a fascist, Hoffman, your Honor.

The Court: I saw him and I heard him.

Mr. Rubin: You are a fascist, Hoffman—] (Tr. 19,781).

Mr. Hoffman: I heard you haven't let anybody free in four years. That's right, stop me.

[The omitted portion of the transcript reads as follows:

The Marshal: That was Mr. Rubin the last time, your Honor.

Clear the court.

The Court: Clear the courtroom, Mr. Marshal.

Mr. Davis: Get as many people as you can. Just like the convention all over again.

The Marshal: Clear the court.

The Court: Clear the court.

A Female Voice: You little prick.

Mr. Rubin: You are a fascist.

The Clerk: Sit down, sir.

The Marshal: Let's clear the court, ladies and gentlemen.

All right. Clear the court. Clear the court, please. Will the defendants leave the counsel table.

Mr. Davis: This is our case.

The Marshal: Your case is not in session.] (Tr. 19,781–82).

Mr. Hoffman: They are all our cases. We are bailing that guy out and every guy that gets arrested.

[The omitted portion of the transcript reads as follows:

Mr. Davis: This is our case.

The Marshal: It is not your case. Get out of the courtroom.

Let's go.

Mr. Hoffman: Oh, yes, I forgot, it's a public trial.

You want to hang him in private.

A Marshal: No spectators. Out. Out.] (Tr. 19,782).

Mr. Hoffman: No spectators while they put them in jail. (Tr. 19,781–82).

### February 5, 1970

## JERRY C. RUBIN

### V

On February 5, after the Court refused to vacate its order revoking defendant Dellinger's bail, Mr. Rubin engaged in several loud outbursts in the courtroom:

### PART I

Mr. Rubin: You haven't been patient at all. You interrupted my at-

---

6. The record is ambiguous as to whether Rubin approached the lectern and pointed his finger at the judge when he made this remark.

torney right in the middle of his argument. He was right in the middle of his argument and you interrupted him. You are not being very patient at all. That is not patience.

The Court: Ask that man to sit down. Note who he is. That is Mr. Rubin.

Mr. Rubin: Jerry Rubin. Can he finish his argument? Can he finish his argument?

The Court: I will ask you to remain quiet, sir.

Mr. Rubin: I will ask you to remain quiet when our attorney represents us in making his arguments. (Tr. 19,-795–96).

\* \* \* \* \* \*

PART II

Mr. Rubin: Gestapo.

Mr. Hoffman: Show him your .45. Show him a .45. He ain't never seen a gun.

Mr. Rubin: This is justice? Huh? Lawyers can't even make an argument? You're a disgrace.

The Clerk: That is all.

The Clerk: Bring in the jury, Mr. Marshal.

Mr. Rubin: You are the laughing stock of the world, Julius Hoffman; the laughing stock of the world.

Mr. Hoffman: Mies van derRohe was a Kraut too.

Mr. Rubin: Every kid in the world hates you, knows you what you represent.

Marshal Dobowski: Be quiet, Mr. Rubin.

Mr. Rubin: You are synonymous with the name Adolf Hitler. Julius Hoffman equals Adolf Hitler today. (Tr. 19,802–03).

A few minutes later, after the witness Lawyer had taken the stand, Mr. Rubin again engaged in the following outburst:

PART III

The Court: Mr. Marshal, will you tell [sic, ask] the defendant Hoffman to remain quiet.

Mr. Hoffman: Schtunk.

Mr. Rubin: You are a tyrant; you know that.

The Court: Mr. Marshall [sic, Marshal], will you ask Mr. Rubin to remain quiet.

Mr. Rubin: Black robes of death.

Marshal Dobowski: Mr. Rubin, I am asking you to be quiet again.

Mr. Rubin: Why don't you ask him so the lawyer [sic, lawyers] can argue.

Marshal Dobowski: Be quiet.

Mr. Rubin: You're in a very funny role, Ron (Marshal Dobowski). You're in a very funny role. If he ordered you to kill me, would you do it?

Marshal Dobowski: Be quiet.

Mr. Rubin: You tell him to keep quiet so my lawyers can speak. (Tr. 19,814–15).

\* \* \* \* \* \*

PART IV

Mr. Kunstler: May we have a time when your Honor would sign this order?

The Court: I will do it as soon as I can, sir.

Mr. Rubin: Tyrant.

The Court: Mr. Marshal, please have that man refrain from using those epithets.

Mr. Rubin: It is just descriptive. Just describing what I see. (Tr. 19,-818–19).

At the close of that morning session on February 5, the defendant Rubin once more exclaimed in a loud voice:

PART V

Mr. Rubin: Tyrant. (Tr. 19,877).

ABBOTT H. HOFFMAN

VI

On February 5, after the Court had decided not to reinstate Mr. Dellinger's bail, Mr. Hoffman made the following remarks in the outburst which ensued:

PART I

Mr. Hoffman: Your idea of justice is the only obscenity in the room. You

schtunk! Vo den! Shanda fur de goyem! [*sic*, "Huh." omitted]

Obviously it was a provocation. That's why it has gone on here today because you threatened him with the cutting of his freedom of speech in the speech he gave in Milwaukee.

The Court: Mr. Marshal, will you ask the defendant Hoffman to—

Mr. Hoffman: This ain't the Standard Club.

The Marshal: Mr. Hoffman—

Mr. Hoffman: Oh, tell him to stick it up his bowling ball.

How is your war stock doing, Julie? You don't have any power. They didn't have any power in the Third Reich either.

The Court: Will you ask him to sit down, Mr. Marshal?

The Marshal: Mr. Hoffman, I am asking you again to shut up.

Mr. Rubin: Gestapo.

Mr. Hoffman: Show him your .45. Show him a .45. He ain't never see [*sic*, seen] a gun. (Tr. 19,801–02).

[The omitted portion of the transcript reads as follows:

Mr. Rubin: This is justice? Huh? Lawyers can't even make an argument? You're a disgrace.

The Clerk: That is all.

The Court: Bring in the jury, Mr. Marshal.

Mr. Rubin: You are the laughing stock of the world, Julius Hoffman; the laughing stock of the world.] (Tr. 19,802–03).

Mr. Hoffman: Mies van derRohe was a Kraut, too. (Tr. 19,803).

[The omitted portion of the transcript reads as follows:

Mr. Rubin: Every kid in the world hates you, knows what you represent.

Marshal Dobowski: Be quiet, Mr. Rubin.

Mr. Rubin: You are synonymous with the name Adolf Hitler. Julius Hoffman equals Adolf Hitler today.

Mr. Kunstler: Your Honor, we would like the jury instructed that Mr. Dellinger is in custody, and we would like an opportunity to address the jury as to exactly why the defense considers him held in contempt.

The Court: You will not have that opportunity.

Mr. Schultz: And will the defendants and the defendants' attorneys be instructed to make no reference to this in the presence of the jury. That's right.] (Tr. 19,803).

Mr. Hoffman: You know you cannot win the fucking case. The only way you can is to put us away [*sic*, "is" omitted] for contempt. We have contempt for this court, and for you Schultz, and for this whole rotten system. That's the only justice. That is why the went [*sic*, they want] this because they can't prove this fucking case. (Tr. 19,803–04).

\* \* \* \* \* \*

## PART II

Mr. Hoffman: You put him in jail because you lost faith in the jury system. I hear you haven't lost a case before a jury in 24 tries. Only the Krebiozen people got away. We're going to get away too. That's why you're throwing us in jail now this way.

Contempt is a tyranny of the court, and you are a tyrant. That's why we don't respect it. It's a tyrant. (Tr. 19,814).

[The omitted portion of the transcript reads as follows:

The Court: Mr. Marshal, will you ask the defendant Hoffman to remain quiet?

Mr. Hoffman: Schtunk.

Mr. Rubin: You are a tyrant, you know that.

The Court: Mr. Marshal, will you ask Mr. Rubin to remain quiet.

Mr. Rubin: Black robes of death.

Marshal Dobowski: Mr. Rubin, I am asking you to be quiet again.

Mr. Rubin: Why don't you ask him so the lawyers can argue.

Marshal Dobowski: Be quiet.

Mr. Rubin: You're in a very funny role, Ron. You're in a very funny role. If he ordered you to kill me, would you do it?

Marshal Dobowski: Be quiet.

Mr. Rubin: You tell him to keep quiet so my lawyers can speak.] (Tr. 19,814–15).

Mr. Hoffman: The judges in Nazi Germany ordered sterilization. Why don't you do that, Judge Hoffman? (Tr. 19,815).

[The omitted portion of the transcript reads as follows:

The Court: Mr. Marshal, will you order that defendant to remain quiet. The lawyers have documents to look at.

Marshal Dobowki [*sic*]: Just keep quiet.] (Tr. 19,815).

Mr. Hoffman: We should have done this long ago when you chained and gagged Bobby Seale. Mafia controlled pigs. Racist. (Tr. 19,816).

[The omitted portion of the transcript reads as follows:

The Marshal:

[*sic*, "Mr. Hoffman:" omitted] We should have done it. It's a shame this building wasn't ripped down.

The Court: Mr. Marshal, will you have Mr. Hoffman remain quiet, please? Order him to remain quiet.

Mr. Hoffman: Order us? Order us? You got to cut our tongues out to order us, Julie.

You railroaded Seale so he wouldn't get a jury trial either. Four years for contempt without a jury trial.

The Marshal: Mr. Hoffman, will you shut up.] (Tr. 19,816).

Mr. Hoffman: No, I won't shut up. I ain't an automaton like you. I don't want to be a tyrant and I don't care for a tyrannical system. Best friend the blacks ever had, huh. How many blacks are in the Drake Towers? How many are in the Standard Club? How many own stock in Brunswick Corporation? (Tr. 19,816–17).

And later in the day Mr. Hoffman, at the end of the session, made the additional comment:

PART III

Mr. Hoffman: It was every man. We'll see you at the Standard Club, Julie. (Tr. 19,877).

February 6, 1970

ABBOTT H. HOFFMAN

VII

On February 6th, the defendant Hoffman attempted to hold the court up to ridicule by entering the courtroom in judicial robes (Tr. 19,888) which he later removed, threw to the floor and used to wipe his feet.

JERRY C. RUBIN

VI

On February 6, at 10:29 a. m., after the courtroom had been filled by the press and spectators and all participants, except the defendants Rubin and Hoffman, were prepared to begin the proceedings, the defendant Rubin entered the courtroom wearing judicial robes. This conduct was a deliberate and wilful attempt to ridicule the court. (Tr. 19,888).

[The relevant transcript with respect to both of these specifications reads as follows:

The Court: May the record show defendants Hoffman and Rubin came in at 1:28, with their—

Mr. Rubin: The marshal just came and asked us to come in. We came as soon as we were asked.

**1348**

The Court: And also attired in what might be called collegiate robes.

Mr. Rubin: Judges' robes, sir.

A Defendant: Death robes.

The Court: Some might even consider them judicial robes.

Mr. Rubin: Judicial robes.

The Court: Your idea, Mr. Kunstler? Another one of your brilliant ideas?

Mr. Kunstler: Your Honor, I can't take credit for this one.

The Court: That amazes me.] (Tr. 19,888).